## STATE *vs.* BRADFORD KNIGHT.

Kennebec.    Opinion August 13, 1901.

*Murder.    Insanity.*

It is still held by an overwhelming weight of judicial authority, that when the insanity of the accused is pleaded in defense, the test of his responsibility for crime afforded by his capacity to understand the nature and quality of the act he was doing, and his mental power to distinguish between right and wrong with respect to that particular act at the time he committed it, is the only proper legal criterion; and that when fully developed and explained to the jury in its application to the special facts and circumstances of different cases, it will always be found adequate to meet the demands of justice and humanity toward the accused, as well as to insure the protection and safety of the public.

It is evident that much of the diversity of opinion, or the difference in modes of expression upon this subject, arises from a failure to discriminate between that irresistible impulse produced by an insane delusion or mental disease, which has progressed to the extent of dethroning the reason and judgment and destroying the power of the accused to distinguish between right and wrong as to the act committed, and that uncontrollable impulse which is alleged to arise from mental disease, and to co-exist with the capacity to comprehend the nature and wrongfulness of the act, but which may with equal reason and consistency be attributable to moral depravity and criminal perversity.

The defendant was convicted of murder in the first degree. His counsel contended that an uncontrollable insane impulse to commit a criminal act may co-exist with full knowledge of the wrongfulness of the act, and that the legal test of responsibility for crime afforded by the knowledge of right and wrong respecting the act committed, has proved to be insufficient and unsatisfactory. And counsel for the defendant requested instructions accordingly to the jury.

But, as it is not in controversy that the instructions actually given to the jury were in harmony with the intellectual test of responsibility, approved by this court, in 1870, in *State* v. *Lawrence,* 57 Maine, 574, *held;* that the refusal to give the requested instructions was fully justified.

*Held;* that the defendant's requests do not assume the existence of an insane delusion or any mental disease sufficient to override his reason and judgment, obliterate his sense of right and wrong, and deprive him of the power to choose between them. On the contrary, they presuppose " sufficient mental capacity and reason to enable him to distinguish between right and wrong as

to the particular act," and still declare him irresponsible if, by reason of mental disease, he did not have sufficient will-power to refrain from committing the act.

*Also*; that if such a state of mind as that contemplated by the requests may in reality exist, and the rule contended for be abstractly correct, there is nothing in the evidence presented in the careful recapitulation of the presiding justice which has any tendency to prove that the accused, at the time he committed the act, was impelled by any insane delusion respecting it, or by any uncontrollable impulse caused by mental disease. The requested instructions would not have been relevant to any proposition which the facts in evidence necessarily tended to establish. The requested instructions were, therefore, properly refused.

*State* v. *Lawrence*, 57 Maine, 574, re-affirmed

On exceptions by defendant.   Overruled.

The defendant was indicted and tried in this court, in Kennebec county, for the murder of Mamie Small. The only issue raised in defense was the defendant's insanity. In support of this defense, certain instructions to the jury were requested. They are found in the opinion of the court. Exceptions were also taken to instructions actually given.

The case appears in the opinion.

*G. W. Heselton*, county attorney, for State.

*H. M. Heath and C. L. Andrews*, for defendant.

The issues are raised upon the refusal of the court to give one, or all, of the four requests. They involve substantially the same rule of law. The second request differs from the first only in adding the element of consciousness that the act was wrong and punishable. The third request combines the first and second. The fourth combines all three with some preliminary definitions. The substance of the contention is the position that a diseased will should excuse from guilt as fully as a diseased intellect. As framed and built up, the requests require the jury to find, first, that the mind of the respondent at the time of the killing was diseased; next, that by reason of such mental disease his will-power was then impaired; next, that such impairment of his will-power was caused by such mental disease and that he did not then have sufficient will-power to refrain from committing the act, and finally, that the act itself was the product of such mental disease.

Philosophically, it means a recognition of the well-known scientific fact and principle that from disease of the mind will flow a disease of the will, and that when the killing is the result or product of such a disease there can be no criminal intent. They rest upon the opening definition of the fourth request that criminal intent involves a sound will as a part of the requirement of a sound mind, not a weak will, not a will enfeebled by passion or by prejudice, but a diseased will. That a man may reason, may know his act to be wrong, that he may be conscious that the act is punishable, should not make him responsible, if knowing the wrong, his diseased will will not suffer him to do the right.

The development of the judge-made rule upon insanity has been slow and wrested from the courts by the progress of scientific truth. We need cite no cases to call the attention of the court to the early rule that no man should be declared irresponsible unless shown to occupy the level of the brute. Next followed the infant test. The self-evident inhumanity of these rules, and the progress of scientific truth pushed the courts a step higher and forced them to recognize the intellectual test. Here they hang stubbornly. The answers of the judges to the questions put by the House of Lords have received a wider recognition than they deserve. Without argument and without contention between parties, these answers have dominated the courts of the common law. We submit that the time must come when courts must cease to shut their eyes to scientific truth.

Of case law to support this contention there is but little. In *State* v. *Felter*, 25 Iowa, 67, the principle is recognized that where the want of power of control arises from the insane condition of the mind of the accused, he is not responsible, and *State* v. *McWherter*, 46 Iowa, 88, shows a recognition of the principle that a mental disease may overpower the will.

In *Bradley* v. *State*, 31 Ind. 422, it is suggested by the court that the intellectual test assumes the existence of one faculty, the understanding, and that only the understanding (or intellect) is liable to disease; that it is true that the hospitals are full of patients with healthy intellects and diseased wills; that insanity

must be recognized as a disease that may impair or totally destroy either the understanding, or the will, or both.

In *Green* v. *State*, 64 Ark. 523, we find a case specifically holding that a person who kills another, knowing at the time that he is committing a wrong act is not legally responsible for the act if, at the time of the killing, he is so affected with a disease of the mind as thereby to have lost the power of choosing between right and wrong, and to avoid doing the act, provided that at the same time the crime is so connected with such mental disease in the relation of cause and effect as to have been the product of it solely.

I am asked by a member of the court, in argument, what test the court would give to the jury for the application of the rule contended for. I answer, insanity is a fact. It is the province of the jury and not of the court to determine the facts. The inhumanity and want of logic in the present rule comes from the position of the court that to-day takes away from the jury its full constitutional power of deciding the entire fact. The State contends that there was no evidence tending to establish such issues. The respondent bases his contention largely upon the memorandum written by the prisoner within an hour before the killing of the girl. No sane man could have written it. This man was insane ten years ago, confessedly insane at the trial, insane to-day; remanded to the insane hospital as soon as the verdict was rendered upon the motion of the government itself. No man conscious that his act was wrong, and master of his own actions, could have written such a memorandum. It may not be sufficient evidence to satisfy the court that his will was diseased and not his own; it may not be sufficient to satisfy a jury. It was evidence tending to support the contention and, because it tended to support it, we had a right to have the rule given.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, FOGLER, PEABODY, JJ.

WHITEHOUSE, J. In this case the respondent was indicted and tried for the murder of Mamie Small. It was not in controversy

that the accused, if responsible for his act, was guilty of murder in the first degree; and the only issue raised in defense was the insanity of the defendant. The jury returned a verdict of "guilty of murder in the first degree," and the case comes to this court on exceptions taken by the defendant to the refusal of the presiding justice to give certain instructions, and to the instructions actually given, in the charge, as follows:

First. If the jury find that the mind of the respondent at the time of killing Mamie Small was diseased, that by reason of such mental disease his will-power was then impaired, that by reason of such impairment of his will-power so caused he did not then have sufficient will-power to refrain from committing the act, and that the act was the product of such mental disease, he was not responsible for the act, although he then had sufficient mental capacity and reason to enable him to distinguish between right and wrong as to the particular act he was doing.

Second. If the jury find that the mind of the respondent at the time of killing Mamie Small was diseased, that by reason of such mental disease his will-power was then impaired, that by reason of such impairment so caused he did not then have sufficient will-power to refrain from committing the act, and that the act was the product of such mental disease, he was not responsible for the act, although then conscious that the act was wrong and punishable.

Third. If the jury find that the prisoner at the time of killing Mamie Small had a diseased mind, that such mental disease caused him to determine to kill her, that by reason of such mental disease he did not then have sufficient will-power to refrain from committing the act, and that the act was the product of such mental disease, he was not responsible for the act, although then conscious that the act was wrong and punishable.

Fourth. Criminal intent involves a sound will as a part of the requirement of a sound mind. That a person is shown to have had, at the time of the act, capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he was then doing, does not necessarily make him responsible. If

the jury find that the mind of the prisoner at the time of killing Mamie Small was diseased, that by reason of such mental disease his will-power was then impaired, that by reason of such impairment of his will-power so caused he did not then have sufficient will-power to refrain from committing the act, and that the act was the product of such mental disease, he was not responsible for the act, although he then had capacity and reason sufficient to enable him to distinguish between right and wrong as to the act.

Fifth. To the following instruction in the charge: "To establish the proposition that he was insane in the legal sense, and therefore not criminally responsible, the respondent must prove that, at the time of doing the act, he was afflicted with mental disease of such character or extent that he had not then the mental capacity sufficient to distinguish between right and wrong as to the particular act he was doing; or, in other words, that he had not knowledge, consciousness or conscience enough to know that the act he was doing was wrong and criminal, and one for which he would be liable to punishment; or, in still other words, that he was so afflicted by mental disease as not to know the nature and quality of the act he was doing; or if he did know that much, he yet did not know that the act was unlawful and wrong. If he does prove that much, it establishes the proposition that he was legally unsound; insane in the legal sense."

Sixth. To the following instruction in the charge: "Again, whatever was the character or extent of his mental disease, if any he had, if he yet had sufficient mental capacity to understand and know the situation, to understand and remember the nature and quality of the act he was doing, that it was unlawful and wrong, he was not then insane in the legal sense of that term."

Seventh. To the following instruction: "He must show then, first: the existence at that time of some mental disease; secondly, that the disease was of such character or extent that it deprived him at that time of the usual mental capacity necessary to understand the nature and quality of the act he was doing, its character and consequences; in other words, the mental capacity to distin-

guish between right and wrong as to that particular act. He must show the connection between a mental disease, if there was one, and this unhappy result by the reduction of his mental capacity to the state which I have described. If both are shown, namely, the existence of the mental disease and its extent to the point I have described, then he was insane in the legal sense and the killing was simply the unfortunate result of mental disease; otherwise, the killing must be held to be the result of the man's vicious acts for which he is responsible."

It is expressly admitted in the bill of exceptions that "the case and the contentions, both of the state and of the respondent, were fully and accurately stated in the charge, so far as necessary to explain and illustrate the instructions given, and that "the respondent adopts, as a part of these exceptions, all statements of facts and of contentions in the charge." The relevancy of the requested instructions to any propositions of fact which the evidence necessarily tended to establish, and the soundness of the instructions given to which exceptions were taken, must therefore be considered and determined, so far as necessary to a decision of the question presented by the exceptions, upon an examination of the recitals of evidence and statements of fact contained in the charge to the jury.

The relations between the respondent and the deceased, and the circumstances attending the commission of the homicide, are thus stated in the charge: "To prove the presentment, in the first instance, the State has introduced evidence tending to show that, upon the seventeenth day of February last, Bradford Knight was acquainted with Mamie Small; had married her sister; had been intimate with her, probably to an undue degree. I think there is no question but that he was, as we say, criminally intimate with her; had sexual relations with her, forbidden by law and amounting to the crime of adultery; that he had known her many years; that on the afternoon of February seventeenth, shortly after or about dinner time, he was on the other side of the river, in the town of Randolph, inquiring for the residence of the man with whom Mamie Small at that time was boarding; that he went up to the residence and then came back. He is afterwards seen going to

Augusta, then going back to Gardiner, and is seen in the evening upon the common in Gardiner, as you have heard described by a witness, walking back and forth alone in the walks of that common. Then it appears by another witness that Mamie Small, in the evening, left her boarding place upon the Randolph side with a young boy, came across the bridge into Gardiner, and passed up by this common where he was walking back and forth; that he came out and addressed her and inquired what the trouble was about, and that she replied to him sharply, that if he did not let her alone, she would make trouble for him; that she thereupon started to run ahead and turned into a walk, past a house, into the back door of a house; that he followed on after her, if I remember correctly, cutting across the sidewalk, not following around the turn, but cutting across, reached her, seized her with his left hand, and fired three shots at that close range into her body; that she screamed and fell; that he started and ran back, meeting some one and telling him that the shots were from another direction, and went on down to his old home in Richmond."

The facts disclosed by the state's evidence, as well as those adduced in behalf of the respondent, were then carefully grouped and critically reviewed by the presiding justice, special attention being called to the following memorandum found on the respondent's person after the homicide, and relied upon as an important evidence in his behalf, to wit:

"Feb. 17, 1899.

"I am in Gardiner to night for the purpose of shooting Mamie Small. I have been to Augusta to see my wife to get her go to Gardiner to see Mamie I have told my wife that I wanted to see Mamie and talk with her and see if she cant fix up the trouble between Mamie and I "

It is not in controversy that the instructions actually given to the jury were in entire harmony with the intellectual test of criminal responsibility approved in *State* v. *Lawrence*, 57 Maine, 574, and cases there cited, and that the refusal to give the requested instructions was fully justified by the doctrine of that case. But, it is earnestly contended, by the learned counsel for

the defendant, that an uncontrollable insane impulse to commit a criminal act may co-exist with full knowledge of the wrongfulness of the act, and that the legal test of responsibility for crime afforded by the knowledge of right and wrong, respecting the act committed, has proved to be insufficient and unsatisfactory. It is accordingly insisted that the time has now arrived, when this criterion of responsibility can be safely modified by incorporating into the rule the element of irresistible impulse presented in the defendant's requests.

It is undoubtedly true, that in the progressive development of the medical jurisprudence of insanity more enlightened views have gradually prevailed respecting the functional activity of the mind, and the course of symptoms indicating mental disease, and that just conclusions have more frequently been reached by courts and juries in recent years in regard to the relation of insanity to criminal responsibility. But since the announcement of the decision by this court in *State* v. *Lawrence*, supra, in the year 1870, this abstruse and difficult question has been the subject of exhaustive re-examination and renewed study, in the light of all modern discoveries of scientific truth bearing upon it by the most eminent medical and legal jurists in this country and England, and by courts of the highest authority in both countries; and it is still held by an overwhelming weight of judicial authority that when the insanity of the accused is pleaded in defense, the test of his responsibility for crime afforded by his capacity to understand the nature and quality of the act he was doing, and his mental power to distinguish between right and wrong with respect to that particular act at the time he committed it, is the only proper legal criterion; and that when fully developed and explained to the jury, in its application to the special facts and circumstances of different cases, it will always be found adequate to meet the demands of justice and humanity towards the accused, as well as to insure the protection and safety of the public.

In Browne's "Medical Jurisprudence of Insanity," published in England in 1875 and re-published in this country, the author critically analyzes the famous answers given by the English judges to

the questions proposed to them by the House of Lords after the trial of MacNaughton in 1843 (§§ 10-14), which have formed the basis of the prevailing rule since that time, and the one approved in *State* v. *Lawrence*, supra, and then proceeds as follows (§ 15) : "After the fullest examination of the medical opinions on the other side, we are constrained to hold that the answers of the judges are a most satisfactory statement of the law, and that no better test of responsibility could, at the present time, be devised than that which makes knowledge of right and wrong at the time of the commission of the act, the means of judging of the punishability of the person who has committed a criminal offense. 'Although not a test of insanity,' says Dr. Hammond, 'the knowledge of right and wrong is a test of responsibility. . . . . Any individual having the capacity to know that an act which he contemplates is contrary to law, should be deemed legally responsible and should suffer punishment. He possesses what is called by Bain punishability. . . . . The only forms of insanity which, in my opinion, should absolve from responsibility. . . . . are such a degree of idiocy, dementia or mania as prevents the individual from understanding the consequences of his act, and the existence of a delusion in regard to a matter of fact which if true would justify his act.'"

In the elaborate work on Medical Jurisprudence by Witthaus and Becker, published in New York in 1896, is a treatise on the "Medical Aspects of Insanity in its Relations to Medical Jurisprudence" by Dr. Fisher of New York. In that portion of the treatise devoted to "Impulsive Insanity" the author says (Vol. 3, p. 273) : "The practice of the courts in England and in this country, following the trial of MacNaughton in 1843, has been that every man is presumed to be sane and to possess a sufficient degree of reason to be responsible for his acts, unless it can be clearly proved that, at the time of committing the act, the accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did, that he did not know he was doing wrong. Under these rules which may be taken as outlining the law on this subject in a large

number of the United States, the defense of irresistible impulse to do what is known to be morally wrong and what is legally a crime cannot be set up; for if the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, it is punishable. . . . . All forms of crime may be committed under the influence of irresistible impulse—homicide, suicide, arson, theft and various acts indicative of sexual perversion. We may also have melancholia or mania associated with this condition, and more rarely delusions and hallucinations. It is not, however, in these latter conditions that we should consider this disease as an entity. In fact, the only safe course is to follow the dictum of the law in this respect, which virtually says that irresistible impulse is no defense unless a symptom of insanity."

Again, in the treatise on "Mental Unsoundness in its Legal Relations," in the same volume, by Mr. Becker, the author says, on page 421–2: "But evidence of the loss of control of the will, or of morbid impulse, does not constitute a defense, except when it demonstrates mental unsoundness of such a character as to destroy the power of distinguishing right and wrong as to the particular act. . . . . This rule is the legal essence of the whole matter, and it avoids much of the confusion which the German jurists and metaphysicians have infused into this subject. The New York Court of Appeals in the case of *Flanagan* v. *The People*, 52 N. Y. 467 (1873), said: 'We are asked in this case to introduce a new element into the rule of criminal responsibility in cases of alleged insanity, and to hold that the power of choosing right from wrong is as essential to legal responsibility as the capacity of distinguishing between them; and that the absence of the former is consistent with the presence of the latter. The argument proceeds upon the theory that there is a form of insanity in which the faculties are so deranged that a man, though he perceives the moral quality of his acts, is unable to control them, and is urged by some mysterious pressure to the commission of acts, the consequences of which he anticipates but cannot avoid. Whatever medical or scientific authority there may be for this view, it has not been accepted by

courts of law. The vagueness and uncertainty of the inquiry which would be opened, and the manifest danger of introducing the limitation claimed into the rule of responsibility, in cases of crime, may well cause courts to pause before assenting to it. Indulgence in evil passions weakens the restraining power of the will and conscience; and the rule suggested would be the cover for the commission of crime and its justification. The doctrine that a criminal act may be excused upon the notion of an irresistible impulse to commit it, where the offender has the ability to discover his legal and moral duty in respect to it, has no place in the law.'"

This rule was subsequently incorporated into the Penal Code of New York, and re-affirmed in *People* v. *Carpenter*, 102 N. Y. 238 (1886), and in *People* v. *Taylor*, 138 N. Y. 398 (1893.)

In the "Medical Jurisprudence of Insanity or Forensic Psychiatry" by Dr. S. V. Clevenger of Chicago, published in 1898, the author concedes that the test of right and wrong as to the particular act charged is generally accepted in the United States in determining the question of responsibility for crime (Vol. 2, p. 18,) and abundantly justifies the concession by a vast array of "Legal Adjudications in Criminal Cases" cited in chapter 7 of the same volume.

In *State* v. *Erb*, 74 Mo. 199 (1881), a requested instruction that if the accused "was incapable of distinguishing right from wrong, or of exercising control or will-power over his actions, or was unconscious at times of the nature of the crime he was about to commit," he should be acquitted, was held to have been properly refused, and this decision was re-affirmed in *State* v. *Pagels*, 92 Mo. 300 (1887), the court saying in the opinion in the latter case, "It will be a sad day for this state when uncontrollable impulse shall dictate a rule of action to our courts."

In a very elaborate discussion of the subject by the Supreme Court of Appeals in *State* v. *Harrison*, 36 West Va. 729 (1892), the authorities are critically examined and compared and the doctrine of "irresistible impulse" emphatically repudiated. In the opinion it is said: "For myself, I cannot see how a person who rationally comprehends the nature and quality of an act, and

knows that it is wrong and criminal, can act through irresistible innocent impulse. Knowing the nature of the act well enough to make him otherwise liable for it under the law, can we say that he acts from irresistible impulse and not criminal design and guilt?

. . . .

"I admit the existence of irresistible impulse, and its efficacy to exonerate from responsibility, but not as consistent with an adequate realization of the wrong of the act. It is that uncontrollable impulse produced by the disease of the mind, when that disease is sufficient to override the reason and judgment and obliterate the sense of right as to the act done, and deprive the accused of the power to choose between them. This impulse is born of the disease, and when it exists, capacity to know the nature of the act is gone. This is the sense in which 'irresistible impulse' was defined in *Hopps* v. *People*, 31 Ill. 385, and *Dacy* v. *People*, 116 Ill. 556." See also *State* v. *Felter*, 25 Iowa, 67; *State* v. *Mewherter*, 46 Iowa, 88; *State* v. *Nixon*, 32 Kan. 205; *Ortwein* v. *Com.*, 76 Pa. St. 414; *People* v. *Hoin*, 62 Cal. 120; *U. S.* v. *Guiteau*, 10 Fed. Rep. 195.

In the " History of the Criminal Law of England," by Mr. Justice James Fitz-James Stephen, published in 1883, after a searching examination of the latest and most authoritative medical works upon insanity, and a critical review of the English law upon the question of responsibility for crime, the distinguished author says (Vol. 2, pages 170–171): " The man who controls himself refers to distant motives and general principles of conduct and directs his conduct accordingly. The man who does not control himself is guided by the motives which immediately press upon his attention. If this is so, the power of self-control must mean a power to attend to distant motives and general principles of conduct, and to connect them rationally with the particular act under consideration ; and a disease of the brain which so weakens the sufferer's powers as to prevent him from attending or referring to such considerations; or from connecting the general theory with the particular fact, deprives him of the power of self-control.

" Can it be said that a person so situated knows that his act is

wrong? I think not, for how does any one know that any act is wrong except by comparing it with general rules of conduct which forbid it, and if he is unable to appreciate such rules, or to apply them to the particular case, how is he to know that what he proposes to do is wrong? . . . . If the words 'know' and 'wrong' are construed as I should construe them, I think this is a matter of no importance, as the absence of the power of self-control would involve an incapacity of knowing right from wrong. . . . . All that I have said is reducible to this short form :— Knowledge and power are the constituent elements of all voluntary action, and if either is seriously impaired the other is disabled. It is as true that a man who cannot control himself does not know the nature of his acts as that a man who does not know the nature of his acts is incapable of self-control."

It is evident that much of the diversity of opinion, or difference in modes of expression upon this subject, arises from a failure to discriminate between that "irresistible impulse" produced by an insane delusion or mental disease which has progressed to the extent of dethroning the reason and judgment and destroying the power of the accused to distinguish between right and wrong as to the act he is committing, and that uncontrollable impulse which is alleged to arise from mental disease and to co-exist with the capacity to comprehend the nature and wrongfulness of the act, but which may with equal reason and consistency be attributable to moral depravity and criminal perversity.

In the case at bar, it has been seen that the defendant's requests do not assume the existence of an insane delusion or any mental disease sufficient to override his reason and judgment, obliterate his sense of right and wrong, and deprive him of the power to choose between them. On the contrary, they presuppose "sufficient mental capacity and reason to enable him to distinguish between right and wrong as to the particular act," and still declare him irresponsible if by reason of mental disease he did not have "sufficient will-power to refrain from committing the act."

It is contended, in behalf of the state, that the requests present a contradictory and impossible state of mind in thus assuming that

the accused may have no insane delusions as to the act he is committing, and have full capacity and mental power to comprehend the nature and consequences of the act, to know that it was unlawful and wrong and would subject him to punishment, and yet have no power to refrain from committing it. But, whatever may eventually be declared by the great body of medical jurists to be the psychological truth in regard to the co-existence of uncontrollable impulse and such full capacity to distinguish right from wrong in regard to the act in question, at present, without clear and conclusive proof that such a state of mind may exist and in the absence of any satisfactory test for the discovery of its existence that would be universally applicable in the practicable administration of the criminal law, this court must adhere to the rule approved in *State* v. *Lawrence*, supra, which, as construed and applied in this state, has proved to be an adequate and satisfactory criterion for determining the punishability of the accused when a plea of insanity is interposed in defense.

Furthermore, in the case at bar, if such a state of mind as that contemplated by the requests may in reality exist, and the rule contended for be abstractly correct, there is nothing in the evidence presented in the careful and accurate recapitulation of the presiding justice which has any necessary tendency to prove that the accused, at the time he committed the act, was impelled by any insane delusion respecting it, or by any uncontrollable impulse caused by mental disease. The requested instructions would not have been relevant to any proposition which the facts in evidence necessarily tended to establish. The requested instructions were therefore properly refused.

As already shown, the instructions actually given were in strict conformity with the rule which has hitherto prevailed in this state, and their application to the facts in evidence was made plain by the full and apt explanations given in the luminous charge of the presiding justice.

*Exceptions overruled.*
*Judgment for the state.*