Argued October 10, decided October 17, 1911.

## STATE v. HASSING.

[118 Pac. 195.]

CRIMINAL LAW—EVIDENCE—INSANITY—FOREIGN DOCUMENTS.

1. Section 766, L. O. L., requires that foreign documents shall be proved by the original or by a copy certified by the legal keeper, together with a certificate that the document is a copy of a valid and subsisting document of that country. *Held* that, where a Danish instrument, offered to prove insanity in the family of accused, did not purport to be either an original or copy of an original document, but was a summary of the history of certain members of the family of accused, compiled partly from the records of a public asylum, partly from journals of the family, and partly from oral statements of members thereof, and was not certified in the manner required, it was properly excluded.

HOMICIDE—IRRESISTIBLE IMPULSE—INSTRUCTIONS.

2. Requests to charge on irresistible impulse that the jury must find, beyond a reasonable doubt, not only that accused had sufficient

mental capacity to distinguish right from wrong, but also sufficient will power to control himself from the commission of such an act. etc., were properly refused, as ignoring the difference between an impulse to kill, arising from mental disease or from sudden and sufficient provocation, and one springing from anger or a wicked and furious desire for revenge.

CRIMINAL LAW—MENTAL CAPACITY—INTENT.

3. Section 2408, L. O. L., provides that a morbid propensity to commit prohibited acts existing in the mind of a person who is not shown to have been incapable of knowing the wrongfulness of such acts is no defense to a prosecution therefor. *Held,* to establish a conclusive presumption that a person having sufficient mental capacity to know that an act was wrongful and unlawful is capable of governing his conduct by that knowledge, and of resisting any impulse to violate the law.

HOMICIDE—IRRESISTIBLE IMPULSE.

4. Irresistible impulse to kill is only recognized in a case of manslaughter, defined by Section 1897, L. O. L., providing that, if a person, without malice or deliberation, on sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, shall voluntarily kill another, such person shall be guilty of manslaughter.

CRIMINAL LAW—EVIDENCE—MENTAL CAPACITY—OPINION—WITNESS— QUALIFICATION—DISCRETION.

5. Under Section 727, L. O. L., subd. 10, permitting an intimate acquaintance to give his opinion respecting the metal sanity of a person after giving the reasons therefor, it was not an abuse of discretion to permit such evidence from one who had seen accused very frequently for a period of two weeks before the killing, had talked with him on a great variety of subjects, and with him on two occasions had listened to criminal trials, and also from another who had been his jailer for four months.

CRIMINAL LAW—OBJECTIONS TO TESTIMONY—ESTOPPEL.

6. Accused called a nonexpert to testify as to his sanity. The district attorney objected that a sufficiently intimate acquaintance had not been shown, but that he would not object if he could introduce the same character of testimony. The court said, "Then let it be admitted." The district attorney repeated his understanding that testimony on the same line might be offered by the State, to which accused's counsel replied, "Certainly we could not help it." *Held,* that accused was estopped to object to the same kind of evidence offered by the State from witnesses whose qualifications were as great or greater than those offered for accused.

From Multnomah: JOHN P. KAVANAUGH, Judge.

Statement by MR. JUSTICE MCBRIDE.

The defendant, J. M. W. Hassing, was convicted of the crime of murder in the first degree, committed upon

the person of Edith Hassing, his wife. The defense, so far as disclosed by the appeal, was insanity.

The defense offered in evidence a communication from the chief alienist of the public insane asylum, near Aarhus, Denmark, which appears to be a reply to an official letter of inquiry from the Ministry of Foreign Affairs of Denmark. This communication states that it is disclosed from the records of the asylum, and from the journals of the Hassing family who had been placed there, supplemented with details from certain relatives of the Hassings, that certain relatives of defendant, both in the direct and collateral line, had been insane and confined in the asylum. The names and family history of these persons compiled from the above sources, are given in the communication. It has indorsed upon it the words: "Legalized. The Ministry of Foreign Affairs, Copenhagen, January 27, 1911. For the Minister, H. A. Bornhoft," with the seal of state attached. Accompanying this document is a certificate of the Danish minister to the United States, which is as follows:

"It is hereby certified that in Denmark registers of birth, marriage and death are kept by pastors of the Danish Lutheran Church, who are state officers; that transcripts of parish registers serve as certificates of birth, marriage and death; that the insane asylum near the city of Aarhus is a state institution, and that the chief alienist is keeper of asylum records. It is finally certified that legalization made by the Danish Ministry of Foreign Affairs cover the genuineness of the document legalized and proves that such document originates from the proper Danish authority.

"C. Moltke,
"Minister of Denmark to the United States.
"Washington, D. C., March 8, 1911."

And also a certificate of P. C. Knox, Secretary of State, as to the official character of the Danish minister.

The State objected to the introduction of these documents, and they were excluded. This ruling is assigned as error.

To rebut certain evidence offered by defendant as to his insanity, the State called Fred Nicholson, who testified that he became acquainted with defendant about two weeks before the shooting; that he was with him about three times a week for two weeks, and talked with him on all kinds of subjects; that, at his suggestion, he came twice with him to the courthouse to listen to murder trials, where the defense was insanity; that in his judgment he was sane. The State also called J. C. Tally, jailer, who had been in charge of the prisoner for nearly four months. He testified that defendant did not act differently from other prisoners, and expressed the opinion that he was sane. The admission of this testimony is also assigned as error.

The court was requested by defendant's counsel to give the following instructions, both of which were refused:

"You are instructed that before you can find the accused guilty you must find from the evidence, and beyond a reasonable doubt, that he had sufficient mental capacity to distinguish between right and wrong as applied to the act he was about to commit, if he did commit it, and sufficient capacity to be conscious that the said act was wrong, and at the same time sufficient will power and selfcontrol to restrain himself from the commission of such act, and unless you so find beyond a reasonable doubt in this case you must find the defendant not guilty." "You are instructed that in order to convict a person of a crime he must have a memory and intelligence enough to know that the act he is about to commit is wrong, to remember and understand and to know, if he commits the acts, he will be subject to punishment, and reason and will sufficient to enable him to compare and choose between the supposed advantage and gratification so obtained by the criminal act, and the immunity from punishment which he will secure

by refraining from it, and, having so contemplated the act, the will and controlling power to restrain himself from committing it, and unless you find that all these elements concurred in the commission of the act alleged by the defendant, if he did commit it, you must not find him not guilty."

The refusal to give these instructions is assigned as error.                                        AFFIRMED.

For appellant there was a brief over the names of *Mr. John A. Jeffrey* and *Mr. Charles E. Lenon,* with an oral argument by *Mr. Jeffrey.*

For the State there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. George J. Cameron,* District Attorney, *Mr. Joseph H. Page,* Deputy District Attorney and *Mr. John J. Fitzgerald,* Deputy District Attorney, with an oral argument by *Mr. Page.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. There was no error in the ruling of the court, rejecting the communication of the chief alienist of the insane asylum to the Danish Ministry of Foreign Affiairs. Section 766, L. O. L., requires that foreign documents shall be proved "by the original or by a copy certified by the legal keeper thereof, together with a certificate under the great or principal seal of the country or sovereign thereof, that the document is a valid and subsisting document of such country, and that the copy is duly certified by the officer having the legal custody of such original." No such certificate appears upon the copy offered in evidence; nor does the communication purport to be a copy of any original document, but a summary of the history of certain members of the Hassing family, compiled partly from the records of the asylum, partly from journals of the family, and partly from oral statements of members of the family. It was clearly inadmissible.

2, 3. The instructions requested were properly refused. They present the "irresistible impulse" doctrine at its very worst, and entirely ignore the difference between an impulse to kill, arising from mental disease or from "sudden and sufficient provocation," and one which springs from anger, or a wicked and furious desire for revenge. Whatever may be the rule in other jurisdictions, we are of the opinion that the test of insanity in this jurisdiction is the capacity to distinguish between right and wrong. Section 2408, L. O. L., is as follows:

"A morbid propensity to commit prohibited acts, existing in the mind of a person, who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor."

The intent of this statute is to establish a conclusive presumption that a person having sufficient mentality to know that an act is wrongful and unlawful is capable of governing his conduct by that knowledge, and of resisting any impulse to violate the law.

4. The only case in which our law recognizes any irresistible impulse to kill is in Section 1897, L. O. L., which provides:

"If any person shall, without malice express or implied, and without deliberation, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, voluntarily kill another. such person shall be deemed guilty of manslaughter."

This phase of the case was fully presented to the jury in the general charge, and in so presenting it the court was quite as favorable to the defendant as the evidence warranted, since in this case there was no sudden heat of passion and no provocation. Briefly, the evidence disclosed that defendant, for some time before the killing, had beaten and abused his wife, and, in one instance, driven her from home; that he had been arrested for threatening to kill her, and upon his promise

to leave her alone had been allowed his liberty; that, upon her refusal to again live with him, he waited at a dark corner, and, after she had fallen in an attempt to escape from him, shot her to death, and afterwards expressed satisfaction at the deed. The selection of the place, the instrument, and the time to consummate the act showed deliberation and premeditation, and a knowledge of its wrongfulness. Independent of the statute, the weight of authority is against the doctrine that a defense of an irresistible impulse to kill can be upheld in any case where there exists sufficient mentality to know the wrongfulness and unlawfulness of the act.

In *Flanagan* v. *People*, 52 N. Y. 467 (11 Am. Rep. 731), the court, speaking of the doctrine of "irresistible impulse" say: "The argument proceeds upon the theory that there is a form of insanity in which the faculties are so disordered and deranged that a man, though he perceives the moral quality of his acts, is unable to control them, and is urged by some mysterious pressure to the commission of acts, the consequences of which he anticipates, but cannot avoid. Whatever medical or scientific authority there may be for this view, it has not been accepted by courts of law. The vagueness and uncertainty of the inquiry which would be opened, and the manifest danger of introducing the limitation claimed into the rule of responsibility, in case of crime, may well cause courts to pause before assenting to it. Indulgence in evil passions weakens the restraining power of the will and conscience; and the rule suggested would be the cover for the commission of crime and its justification. The doctrine that a criminal act may be excused upon the notion of an irresistible impulse to commit it, where the offender has the ability to discover his legal and moral duty in respect to it, has no place in the law."

In *State* v. *Knight,* 95 Me. 467 (50 Atl. 276 : 55 L. R. A. 373), the court, in an exhaustive opinion, repudiate the theory of an irresistible impulse associated with a capacity to discern right from wrong, and quote with approval from Dr. Hammond, as follows:

"Although not a test of insanity, the ·knowledge of right and wrong is a test of responsibility. * * Any individual having the capacity to know that an act which he contemplates is contrary to law should be deemed legally responsible, and should suffer punishment. He possesses what is called by Bain punishability. * * The only forms of insanity which, in my opinion, should absolve from responsibility * * are such a degree of idiocy, dementia, or mania as prevents the individual from understanding the consequences of his act, and the existence of a delusion in regard to a matter of fact which, if true, would justify his act."

In *People* v. *Hoin,* 62 Cal. 120 (45 Am. Rep. 651), the court, quoting from Baron Bramwell, say:

" 'But if an influence be so powerful as to be irresistible, so much the more reason is there why we should not withdraw any of the safeguards tending to counteract it. There are three powerful restraints existing, all tending to the assistance of the person who is suffering under such an influence, the restraint of religion, the restraint of conscience, the restraint of law. But if the influence itself be held to be a legal excuse, rendering the crime dispunishable, you at once withdraw a most powerful restraint—that forbidding and punishing its perpetration.' We must therefore return to the simple question you have to determine. Did the prisoner know the nature of the act he was doing, and did he know he was doing what was wrong?"

In conclusion the court say:

"Whatever may be the abstract truth, the law has never recognized an impulse as uncontrollable which yet leaves the reasoning powers, including the capacity to appreciate the nature and quality of the particular act, unaffected by mental disease. No different rule has been adopted by American courts."

The power to discriminate between right and wrong, as a test of criminal responsibility, has been adopted by a large majority of the courts of the United States, including Oregon. *State* v. *Murray,* 11 Or. 413 (5 Pac. 55) ; *People* v. *Hoin,* 62 Cal. 120 (45 Am. Rep. 651) ; *Mackin* v. *State,* 59·N. J. Law 495 (36 Atl. 1040) ; *State* v. *Miller,* 111 Mo. 542 (20 S. W. 243) ; *Ford* v. *State,* 73 Miss. 734 (19 South. 665: 35 L. R. A. 117) ; *State* v. *McIntosh,* 39 S. C. 97 (17 S. E. 446) ; *Wilcox* v. *State,* 94 Tenn. 106 (28 S. W. 312) ; *Flanagan* v. *People,* 52 N. Y. 467 (11 Am. Rep. 731) ; *State* v. *Mowry,* 37 Kan. 369 (15 Pac. 282) ; *State* v. *Knight,* 95 Me. 467 (50 Atl. 276: 55 L. R. A. 373) ; *Davis* v. *State,* 44 Fla. 32 (32 South. 822).

The foregoing list does not by any means exhaust the authorities holding to the theory that a knowledge of right and wrong as to the particular act charged is the proper test of legal responsibility. On the other hand, a few courts have admitted with some reservation the theory that an uncontrollable impulse, superinduced by mental disease, even though accompained by capacity to distinguish between right and wrong, is a defense to crime. Dr. Maudsley an eloquent champion of this theory, remarks: "There is a destiny made for a man by his ancestors, and no one can elude, were he able to attempt it, the tyranny of his organization." It is submitted that these writers, and the judges who have adopted their opinion, have dealt with man's moral responsibility as between his Creator and himself, rather than his legal responsibility as a member of organized society. It ought to be plain that if every case tried should involve an investigation of the defendant's ancestry and environment, with a view to determine to what extent these influenced the free and untrammeled action of his will, and how far, in view of these, he was morally responsible for his acts, the investigation would be inter-

minable. While one of the incidental objects of the law is to reform offenders, where they are reformable, its principal object is to protect society, and the only practicable working theory upon which it can proceed is to assume that every man who knows right from wrong can observe right and avoid the wrong.

5. The last assignment to be considered was the admission of the testimony of the witnesses Nicholson and Tally, the first of. whom had seen him very frequently for a period of two weeks before the crime and talked with him on a great variety of subjects, and on two occasions, at his request, had accompanied him to the courthouse to listen to criminal trials, while the latter had been his jailer for about four months. Section 727, L. O. L. subd. 10, permits an "intimate acquaintance" to give his opinion respecting the mental sanity of a person; the reason for such opinion being given. As there are degrees of intimacy the term is somewhat indefinite, but it should certainly extend far enough to enable the witness to know something of the habits, temperament, and general mental characteristics of the party whose sanity is in question. Being an idefinite term, the admission of such testimony is largely in the discretion of the trial court, and we are of the opinion that the testimony admitted is within the rule announced in *State* v. *Murray,* 11 Or. 413 (5 Pac. 55) and *State* v. *Hansen,* 25 Or. 395 (35 Pac. 976: 36 Pac. 296).

6. In addition to this, defendant had called a witness having less intimate acquaintance with him than either of the witnesses called by the State, and when his testimony was objected to, the district attorney said: "I don't think he has shown a sufficiently intimate acquaintance to permit him to testify; but I have no objection if the State can introduce the same character of evidence." The court said: "Very well; then let it be admitted." The district attorney remarked, "If it

is understood that testimony on the same line may be offered by the State," to which counsel for defendant answered, "Certainly; we could not help it." This practically amounted to a stipulation that testimony of the character then being discussed could be admitted, and the testimony of the two witnesses above mentioned was of the same character; their qualifications being as great or greater. Counsel cannot induce the court to adopt an erroneous rule of evidence when it operates in his favor, and be heard to object to the application of the same rule when it militates against him. If he makes it the law of the case, he must abide the consequences. *Trickey* v. *Clark*, 50 Or. 516 (93 Pac. 457).

Counsel for defendant has adverted to the sad consequences and injustice of executing a man in defendant's mental condition, but the jury has found that he knew right from wrong, and understood the nature and quality of the act, and we must assume, in the absence of error by the court, that they found correctly. The duty of condemning any human being to suffer the extreme penalty of the law is one which every court approaches with regret. But if the prayer of his innocent and helpless wife were not sufficient to prevent the defendant from sending a bullet through her brain, as she lay fallen and defenseless before him, no mere considerations of sympathy or pity ought to induce the ministers of justice to bend the law to spare him.

The judgment of the circuit court is affirmed.

AFFIRMED.