STATE of Maine

v.

Ernest B. SHACKFORD, Jr.

Supreme Judicial Court of Maine.

Feb. 19, 1970.

Nicholas S. Strater, Asst. Atty. Gen., Augusta, for plaintiff.

Charles E. Moreshead, Augusta, for defendant.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, WEATHERBEE and POMEROY, JJ.

POMEROY, Justice.

Ernest B. Shackford, Jr., then a 15-year old boy, was on July 1, 1964, found not guilty of the crime of murder, because the jury found the act of killing was the product of a mental disease or mental defect from which he was suffering at the time of the commission of the act. His commitment to the custody of the Commissioner of Mental Health and Corrections pursuant to the provisions of Title 15 M.R.S.A. Sec. 103, followed.

After receiving a report from the Superintendent of the Augusta State Hospital, the Commissioner of Mental Health and Corrections notified the Court on November 13, 1968, that in the opinion of the Superintendent, Shackford could be released and that "his release would not jeopardize the public safety within the foreseeable future due to mental disease or mental defect." After reviewing the report, the then Presiding Justice ordered hearing be held and appropriate notice given.

The cause came on for hearing on March 21, 1969. Prior to the hearing the Court found Shackford was indigent and appointed counsel for him.

After hearing the testimony of two psychiatrists, the Court denied release. In

announcing its decision, the Court said, in part:

> "*The only thing I have to decide under that is whether I find that Mr. Shackford may be released without danger to the public, due to mental disease or mental defect. And the rule I am going to apply is that if I have any reasonable doubt as to that, he ought not to be released.*"

The concluding sentence of his findings was,

> "*I find, after this hearing, that I cannot find that he may be released without danger to the public within the foreseeable future due to mental disease or mental defect, because I have a reasonable doubt concerning the possibility of a regression into another transient episode of psychosis, or acute psychotic episode; so he will now be returned to the State Hospital until further order of Court.*"

Shackford through Court-appointed counsel has appealed. The Points of Appeal are two in number.

1. The Court erred, as a matter of Law, in refusing to release Ernest Shackford, Jr. by establishing as the burden of proof that the Court must be satisfied beyond a reasonable doubt that Ernest Shackford, Jr. had recovered sufficiently to permit release without danger to the public within the foreseeable future due to mental defect or disease.

2. The Court erred, as a matter of Law, in refusing to release Ernest Shackford, Jr., from the Augusta State Hospital because there was no evidence or testimony at his hearing that he was currently suffering from any mental defect or disease as is required by M.R.S.A. Title 15, Sec. 104.

No attack is here made on the commitment procedure provided by statute, (15 M.R.S.A. Sec. 103).

In 1963 our Legislature by Chapter 311, Sec. 3, Public Laws, abandoned what had long been the Maine rule as to criminal responsibility,[1] and adopted a rule which reads as follows:

> "*An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. The terms 'mental disease' or 'mental defect' do not include an abnormalty manifested only by repeated criminal conduct or excessive use of drugs or alcohol.*"

See: State v. Park, 159 Me. 328, 193 A.2d 1 (1963).

Sec. 103, Title 15 M.R.S.A. provides that when a respondent is acquitted, by reason of mental disease or mental defect, excluding responsibility, the verdict and judgment shall so state. In such case, the statute continues, "the Court shall order such person committed to the custody of the Commissioner of Mental Health and Corrections, to be placed in an appropriate institution for the mentally ill or the mentally retarded for care and treatment."

In 1967 our Legislature, by enacting Chapter 402, Public Laws of 1967 (15 M.R.S.A. Sec. 104), adopted a method by which one committed to a mental institution under the provisions of Sec. 103, Title 15 M.R.S.A. could be released conditionally or unconditionally. The statute requires that annually, and at any time, the Superintendent of the institution in which such patient has been placed under Sec. 103 shall report to the Commissioner of Mental Health and Corrections, the Superintendent's opinion as to the condition of such person committed to his institution and such person's readiness for release. In describing the duties of the Superintendent of the institution with regard to such report, the statute uses these words:

> "* * * which opinion in the case of a person found not guilty of crime by reason of mental disease shall indicate

---

1. State v. Lawrence, 57 Me. 574; reaffirmed in State v. Knight, 95 Me. 467, 50 A. 276, 55 L.R.A. 373.

*whether such person is, or is not, restored sufficiently to permit release without danger to the public within the foreseeable future, due to mental disease, and in the case of a person found not guilty of crime by reason of mental defect shall indicate whether such person is, or is not, adjusted, socially and otherwise, so as to permit release without danger to the public within the foreseeable future, due to mental defect."*

The Commissioner is then directed to file the report with the Court in the County in which the person is hospitalized. The Court, the statute says, shall review the report and if it is made to appear by the report that the patient is ready for release, the Court must set a date for holding a hearing on the question of the patient's readiness for release. The Court is further directed to receive the testimony of at least one psychiatrist who has observed or treated such person and any other relevant testimony. In this case the statute was followed precisely.

At the hearing, the testimony of Dr. Allen Saunders, a member of the staff of the Augusta State Hospital, was received. The State appeared by the Attorney General and opposed the recommendation for release which had been made by the Superintendent of the State Hospital. Shackford, through his Court-appointed counsel, objected to the appearance of the Attorney General's Department in opposition to the recommendation for release of the patient filed by the Superintendent. His reasoning was

that the State was the moving party; that the Superintendent of the State Hospital had reported the position of the State and the Attorney General could not advance a position contrary to that of the Superintendent because to do so would involve his Department in a conflict of interest.

■ Shackford's position assumes hearings conducted under 15 M.R.S.A. Sec. 104, are proceedings in which the State is aligned as a party vis-a-vis the patient; that it is for the Superintendent of the State Hospital to determine the State's position as to release and that once the Superintendent had adopted the same position as that of the patient, the "parties" are in agreement and there is, therefore, no issue for determination by the Court.

■ We do not so view the statute. The legislative scheme for determining the length of stay in a mental institution by one found not to be legally responsible for acts which would be criminal but for the existence of a mental disease or defect producing the acts, is as follows:

1. The *Court* is given responsibility for determining the factual issue as to the readiness of the patient for release.[2]

2. The standard prescribed by the Legislature is, can the patient be released and enlarged without danger to the public within the foreseeable future due to his mental disease or mental defect?[3]

---

2. See Ragsdale v. Overholser, 108 U.S. App.D.C. 308, 281 F.2d 943 at pg. 949.

3. *"An examination of these problems requires, first of all, an analysis of how to define 'dangerous to himself or others.' In a democratic society, we believe, the function of delimiting dangerousness for release purposes belongs to the community. Translating community values and policies into an operational definition of dangerousness as been assigned initially to legislators and then to judges as construers of legislative determinations, and not to any particular administrative*

*or professional group, including psychiatrists. This does not imply that psychiatrists as representatives of their profession or as members of the community have no duty to inform legislators and judges with regard to making such decisions as the meaning of 'dangerous to himself or others.' But it does imply that, when engaged as experts to participate in a hearing to determine an individual's readiness for release, they are not to define 'dangerousness,' but are, rather, to ascertain whether the individual is likely or not to engage in conduct which has been characterized as*

The statute provides,

(a) the Justice must hear the testimony of at least one psychiatrist who has observed or treated the patient, and

(b) the Justice may receive and hear other testimony which he deems relevant.

The process which puts the inquiry by the Court in motion is either (1) a petition to the Court filed by the patient, his spouse or any next of kin asking for hearing, (2) the filing of a report by the Commissioner of Health and Corrections with the Court, that it is the opinion of the Superintendent of the Hospital in which the person is a patient that the patient is ready for release.

▮ The proceeding is not a trial in the conventional sense, although procedurally it takes on most of the features of a trial. The function of the Attorney General in such proceeding, is to assist the Court in arriving at the conclusion it is called upon to make by investigating to search out relevant testimony and to marshal the relevant evidence bearing on the question. He is not an "advocate" in the sense that he is not required to espouse any particular position as he would in a criminal case.

▮ The psychiatrist who has observed or treated the patient is but a witness. He is not representing the State. As a witness he is called upon to give his medical diagnosis and medical prognosis. He is not called upon to assume a legal position for and on behalf of the State.

At the hearing ordered by the Presiding Justice, Allen Saunders M.D., testified. From him the Court learned that he was the physician in charge of that section of the State Hospital in which Shackford was confined, both prior to the trial and after a finding by jury that Shackford was not guilty of murder by reason of mental disease or defect.

Dr. Saunders informed the Court that he had testified at Shackford's trial in York County in 1964 and had given as his opinion that there was no psychiatric diagnosis; that he found no symptomatology of any mental disease or defect either during the patient's confinement at the State Hospital prior to the trial or during his confinement after the trial. He described three occasions when the patient attempted to escape from the Hospital. On one, he explained, the patient used a sharp cooking fork directed toward a custodian to effect his escape. He described the patient's conduct in the hospital during the first year following his commitment as "insolent," "uncooperative" and "difficult to get along with."

In response to questions put to him by Shackford's Court-appointed attorney, Dr. Saunders testified as follows:

"Q How would you now characterize Ernest Shackford Jr.'s personalty?

A He is far more outgoing than he was when he came, and he is less prone to resent his confinement, and has cooperated fully for the last year with the hospital routine, freely and fully, which during his early stay there he was unwilling to do.

Q Would you characterize his behavior or his mental condition at any time as being psychotic at all?

A No, sir.

Q Would you say he is not what you consider psychotic?

A He is not now and never has been.

'dangerous.' More specifically, in deciding whether *individual 'x'* is sufficiently 'dangerous' not to be released, the psychiatrist as expert is to perform a purely diagnostic and prognostic function concerning the likely behavior of the person." Goldstein and Katz, Dangerous and Mental Illness, 70 Yale Law Journal, 225 at 230.

*Q   Would you say he is neurotic?*

*A   I would say that he had originally a character which would be charactertized as a withdrawn type of person that is known by psychiatrists under the term of 'schizoid personality', and I believe that is the type of person he was. He was a loner, in ordinary English.*

*Q   Could you explain technically, medically, what a schizoid personality is?*

*A   It is a character disorder which is manifested by the fact that these people demonstrate a tendency to get along better with things than they do with people. They tend to keep more to themselves than they do to socialize.*

*Q   Would you classify this as a mental defect or mental disease?*

*A   No, sir.*

*Q   How would you classify it?*

*A   It is no more mental disorder than if a man is stingy, or a man is extremely jealous, or a man is extremely outgoing. This is a character type. There are people who are outgoing, and there are people who focus on their own inner thoughts. It is a character type and is not considered to be a mental disease or mental defect."*

Dr. Vincent Lathbury, an admittedly qualified psychiatrist was also called. He testified he examined the patient at some length and examined available records concerning the patient. In describing his opinion of Shackford as a person, he said:

*"A   It was my feeling that Mr. Shackford has a schizoid personality, that he has had this for many, many years. Now, a person with a schizoid personality is, I think, not generally considered to be psychotic and suffering from mental disease in the ordinary sense of the word, but a person with a schizoid personality is very prone under stress to regress into an active schizophrenia, and it is my feeling that Mr. Shackford, under this stress, regressed into an acute schizophrenic episode, from which he subsequently recovered and resumed his former schizoid personality.*

*Q   Let me inquire here, he has, in your opinion, still a schizoid personality?*

*A   I would say so, yes.*

*Q   Is it possible for him to regress again into a schizophrenic episode similar to the one he has had?*

*A   I would say that it is. Would you want me to enlarge on this? I have an idea which may be helpful. It was my impression from talking with Mr. Shackford that his condition has improved greatly since he has been at the hospital. What I have to say is rather painful to me because I am essentially a humanitarian who is always in favor of the patient, but at the same time I think you have to try to look facts in the face as much as you can. It is my feeling, to whatever extent it may be correct, that this man is a schizoid personality, and relapsed on one occasion into an active, acute schizophrenic episode. Schizophrenia is well known for its relapsable potentialities. I think it is very encouraging that he is so much better, but at the same time the general criterion has always been, and I think still is, sort of rule of thumb, with exceptions, of course, but usually it is felt that a schizophrenic should go five years without a remission before it is safe to say he will not have another one. This is a rule of thumb which isn't 100% accurate, but it is generally what we proceed on."*

In response to this question, *"In any event, your conclusion, as I understand it, is at least that this is not the time for complete returning to society?"* He answered: *"I would not dare take the responsibility for it if it were up to me."*

The only evidence in the case on the subject was that Mr. Shackford has a schizoid personality. There was certainly ample evidence from which the Court could conclude that this schizoid personality had, under stress, on at least one occasion regressed into an acute schizophrenic episode, and that schizophrenia is known for its relapsable potentialities. This was a finding of fact as to a *medical condition,* which the Court was clearly justified in making, on the basis of an opinion given by a medical expert relating to a *medical* diagnosis.

Shackford argues that there was no evidence before the Court that he was suffering from a mental disease or defect. Dr. Lathbury's report dated December 30, 1968, after describing the prepsychotic personality, said, *"I will state that I find him without mental disease or defect at the present time, at least as I understand the law defines it * *."* (Emphasis supplied)

Dr. Saunders at one point in his testimony was asked if he knew whether Shackford was committed because of a mental disease or a mental defect, and he replied, *"Those two terms were not in effect in the law at that time, but the diagnosis made of epilepsy is a mental defect, and schizophrenia is a mental disease."*

An abnormality manifested only by repeated criminal conduct or excessive use of drugs or alcohol is expressly excluded from the definition of a mental disease or a mental defect in 15 M.R.S.A. Sec. 102. It does not necessarily follow that one with a schizoid personality or any prepsychotic personality is not to be considered as suffering from a mental disease for all purposes. The term "mental disease" as it is employed in 15 M.R.S.A. 102, is not necessarily the same as a mental disease intended to be described in 15 M.R.S.A. § 104.

See Durham v. United States, 99 U.S.App. D.C. 132, 237 F.2d 760 (C.C.A.,D.C.). See also Gunther v. United States, (1954) 94 U.S.App.D.C. 243, 215 F.2d 493 (C.C.A., D.C.)

See also: Sobeloff, Insanity and the Criminal Law, 41 A.B.A.J. 793.

■ The jury before whom Shackford was tried for the crime of murder, found, by a fair preponderance of the evidence, that at the time he took the life of Marsha Hanscom he was suffering from a mental disease which produced the act of killing. The medical condition from which the jury found he was suffering was "schizophrenia." The Court was clearly justified on the evidence, in concluding at the time of the killing, Shackford's schizoid personality had, under stress, regressed into an acute schizophrenic episode. The evidence further justified the Court in finding that Shackford still had a schizoid personality; that schizophrenia is known for its relapsable potentiality and that because of his schizoid personality there was continued danger of relapse under stress into the mental disease from which he was suffering at the time of the killing, i. e., "schizophrenia." In other words, under stress he was liable to relapse into another "acute schizophrenic episode."

Having found the medical condition of the patient at the time of hearing, the Presiding Justice was required to consider and decide the question; could the patient be released and enlarged without danger to the public within the foreseeable future?

■ Shackford's counsel complains that the Presiding Justice announced as a condition of Shackford's release, it would have to be established by evidence, convincing in its effect beyond a reasonable doubt that release could be effected without danger to the public within the foreseeable future. He says the standard of proof is too high.

We think the Presiding Justice announced a correct and appropriate rule.

Inherent in the finding by the jury that the then defendant was not guilty by reason of mental disease or defect, is the conclusion that he did the acts complained of, i. e., he killed Marsha Hanscom and the killing was the product of his mental disease. By so finding the jury put Shackford in what some Courts have called an exceptional class.[4] He became one who is to be held blameless and free from punishment for an act otherwise subject to criminal sanctions.

The Legislature determined that when one enters into this exceptional class, the reasonable and humane thing to do is commit him to a mental hospital where he can undergo medical treatment which will, hopefully, enable him to return to society as a useful member, posing no threat to his own safety or that of the general public. The public acquired a special interest in his confinement and release. That public interest must be protected by the Court. When consideration is being given to his enlargement, that public interest must be weighed against his claimed right to be set free.

The statute does not define the standard of proof. We think it reasonable to require that reasonable medical doubts and reasonable judicial doubts be resolved in favor of the public. Such was the conclusion reached by the United States Court of Appeals, District of Columbia Circuit, in Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960).

We are aware *Ragsdale* was expressly overruled in the same Circuit in a later case. Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968). (Burger, J. (now Chief Justice Burger) not sitting.)

Nevertheless, we find the reasoning of Mr. Chief Justice Burger in *Ragsdale* compelling. No error being shown,

The entry must be,

Appeal denied.

DUFRESNE, J., did not sit.

4. Overholser v. Leach, 103 U.S.App.D.C. 289, 257 F.2d 667 (1958).