In the Matter of LAURENCE LUBLIN, Appellant, v CENTRAL ISLIP PSYCHIATRIC CENTER, Respondent.

Second Department, January 24, 1977

*Donald W. Leo* for appellant.

*Louis J. Lefkowitz, Attorney-General, (Salvatore J. Sidoti, Samuel A. Hirshowitz, Thomas Dorsey* and *Walton Sutherland* of counsel), for respondent.

SHAPIRO, J. The petitioner was found not guilty of the crime of murder by reason of his insanity. He now appeals from an order of the County Court, Suffolk County, dated January 8, 1976, which, after a hearing, denied his motion, made pursuant to CPL 330.20, seeking his discharge or release from the Central Islip Psychiatric Center. The petitioner also appeals from (1) two orders of the same court, both dated September 10, 1975, which authorized the District Attorney of Suffolk County to employ two qualified psychiatrists to examine the petitioner and to testify, (2) so much of a further order of the same court, dated September 17, 1975, as denied his motion to close the hearing pursuant to rule 694.7 (subd [c]) of the Rules of this court (22 NYCRR 694.7 [c]) and (3) another order of the same court, dated February 23, 1976, which denied his motion for reargument. We reverse the order dated January 8, 1976 and remand the proceeding for the purpose hereafter stated.

## THE ISSUES

The major issue is whether the petitioner or the Commissioner of Mental Hygiene had the burden of establishing, under the provisions of CPL 330.20 (subd 3), that the court be "satisfied that the committed person may be discharged or released on condition without danger to himself or others". The County Court held that the burden of proof was on the petitioner.

A second issue is whether the District Attorney who, under the statute, must receive from the Commissioner of Mental Hygiene a copy of the application for release or discharge of the committed person, may be authorized by the court hearing the application to employ psychiatrists to examine the person and call them to testify as to the person's mental condition. The County Court held that it could so authorize the District Attorney. The third issue is whether the County Court committed error in denying petitioner's motion that the hearing be held *in camera*.

## THE GOVERNING STATUTE

CPL 330.20, which deals with the commitment, confinement and release of a defendant acquitted on the ground of mental disease or defect, provides, in relevant part, as follows:

"1. Upon rendition of a verdict of acquittal by reason of mental disease or defect, the court must order the defendant to be committed to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene. The court must direct the sheriff to temporarily hold the defendant pending designation of an appropriate institution in which the defendant must be placed, and when notified by the commissioner of mental hygiene of the designated institution, the sheriff must forthwith cause the defendant to be delivered to the head of such institution. Such defendant is entitled to the assistance of the mental health information service.

"2. If the commissioner of mental hygiene is of the opinion that a person committed to his custody, pursuant to subdivision one of this section, may be discharged or released on condition without danger to himself or to others, he must make application for the discharge or release of such person in a report to the court by which such person was committed and must transmit a copy of such application and report to

the district attorney of the county from which the defendant was committed. The court may then appoint up to two qualified psychiatrists * * * to examine such person, to report within sixty days, or such longer period as the court determines to be necessary for the purpose, their opinion as to his mental condition. * * *

"3. If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it must promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding. After such a hearing, the committed person must be discharged, released on such conditions as the court determines to be necessary, or recommitted to the commissioner of mental hygiene. The commissioner of mental hygiene must make suitable provision for the care and supervision by the department of mental hygiene of persons released conditionally under this section.

\* \* \*

"5. A committed person may make application for his discharge or release to the court by which he was committed, and if, after receiving a report of the commissioner of mental hygiene, the court considers there may be merit in the application, the court must follow the procedure prescribed in subdivisions two and three of this section."

PROCEEDINGS PRELIMINARY TO THE PETITIONER'S
APPLICATION FOR HIS RELEASE

The petitioner was indicted for the murder of his wife in 1971 and thereafter, in May, 1973, was found not guilty by reason of insanity or, as the statute states, "by reason of mental disease or defect." Pursuant to CPL 330.20 (subd 1) he was committed to the custody of the Commissioner of Mental Hygiene who placed him in the Mid-Hudson Psychiatric Center at New Hampton, New York. On May 14, 1974 petitioner was transferred to the Central Islip Psychiatric Center. In the summer of 1974 the director of Central Islip established a Special Release Committee to examine the petitioner to determine whether he was ready to be discharged from the center. On September 11, 1974 that committee reported in the negative. However, a second Special Release Committee, which was appointed soon after to re-examine the petitioner to determine

whether he was ready for discharge, reported, on December 5, 1974, that he was ready for release. That report was signed by the director of Central Islip in January, 1975 and was sent by him, with the petitioner's hospital record, to the Commissioner of Mental Hygiene.

In February, 1975 the commissioner directed Dr. Alphonse P. Falco, a psychiatrist, to form a multi-disciplinary panel to examine the petitioner and make findings of fact and a recommendation on the petitioner's suitability for discharge. He did so. The panel consisted of Dr. Falco, Mr. Gail Kniffen, chief social worker of the Kings Park Psychiatric Center, and Mrs. Marge Lombardo, of the Mental Health Information Service. A report signed by Dr. Falco and Mr. Kniffen, dated February 28, 1975, was sent to the Long Island Regional Director of the Department of Mental Hygiene. The Falco-Kniffen report stated that the third member of the panel, Mrs. Lombardo, was present at all of the interviews and gave the other members the benefit of her observations, but requested that the report be considered independently of her opinions because her duties and responsibilities required that she remain unbiased. The report concluded that the petitioner was "not now psychotic" and that if any recommendation were to be made regarding his application for release "on the basis of Mr. Lublin's present mental status the panel is constrained to agree that he is not presently psychotic." Their report also stated that they were unable to assess the risk in terms of safety of others if he were released; nor could they make any recommendations based on dangerousness "since there were no available criteria to make this sort of prediction." The report was based upon interviews with the petitioner, the ward staff and the petitioner's physicians and their acting unit chief. The ward staff was reported to be unanimous in the opinion that petitioner belonged somewhere else and that he might do well in Las Vegas, where he planned to go, "because there is less structure out there," though all were opposed to his release into a nearby community because they feared he would "continue to plague and annoy them" and might, "if thwarted, become violent". The last view was based "solely on the history of the homicide he previously committed." The petitioner's physicians were unanimous in their opinion that at no time since his admission had he ever demonstrated any symptoms or signs indicative of a psychosis. There was also general agreement that no useful purpose would be served "in

continuing the patient at Central Islip." The physicians also stated their belief that there was a possibility of satisfactory adjustment if the petitioner went to reside with his cousin in Nevada. The diagnostic impression of the signers of the report was that the petitioner was not presently psychotic, that he had an underlying sociopathic personality structure and that "he is suffering from an emotional disorder with an effective component."

On the basis of the foregoing report, the Commissioner of Mental Hygiene informed the court that he could not recommend the petitioner's release "with any confidence that hazard would not attend on such release."

### THE PETITION AND THE COURT'S ACTIONS THEREON

On April 4, 1975, pursuant to CPL 330.20 (subd 5), the petitioner commenced this proceeding in which he requested an order discharging him on such condition as the court deems to be necessary. Counsel was appointed for him under article 18-B of the County Law.

In May and June, 1975, the County Court Judge, pursuant to CPL 330.20 (subd 2), appointed Drs. Morris Binder and Stephen Pellathy, qualified psychiatrists, to examine the petitioner and to report to the court their opinion as to his mental condition. The petitioner then moved to close the hearing; the motion was opposed by the petitioner's mother-in-law, who cross-moved for permission to intervene in the matter *amicus curiae.* In July the District Attorney of Suffolk County moved for authority to employ two qualified psychiatrists to examine the petitioner to enable them to form an opinion as to whether he was suitable for discharge from the Central Islip Psychiatric Center and to testify at the hearing on the petition. By two orders dated September 10, 1975, the County Court granted the District Attorney's motion. On September 17, 1975 the County Court denied both the petitioner's motion to close the hearing and the mother-in-law's motion to intervene in the matter.

### THE HEARING ON THE PETITION

The petitioner waived a jury trial and the court proceeded with the hearing. Before doing so, and in order to determine whether to accept the petitioner's waiver of a jury trial, the court took testimony from Dr. Pellathy to the effect that, on

the basis of his examination of the petitioner on September 29, 1975, he concluded that petitioner was in good contact with reality, could understand legal terms and was capable of understanding the difference between a trial with and without a jury.

One of the petitioner's witnesses was the chief psychiatrist at Central Islip who, on the basis of an examination of the petitioner's hospital and medical records, diagnosed him as having schizophrenia and concluded that, while there was no cure for it, the illness might be in a state of remission. He then stated that his recommendation that the petitioner be released was a calculated risk. Also testifying as witnesses for the petitioner were two psychiatrists from Central Islip who had treated him. Both testified that the petitioner was not dangerous to himself or others and one, who had been on the two Special Release Committees, testified that he had recommended the petitioner's release and still adhered to that opinion, even though the petitioner's mental illness is not curable. The other testified that the petitioner was not in need of continuous psychiatric care in a hospital setting, that his illness was in remission and that he could be released on convalescent care. Finally, the director of Central Islip testified that, in his opinion, the petitioner was not dangerous and should be discharged under convalescent care, to be seen once a week by a treatment team at a clinic in New York State for at least six months.

Testifying for the Commissioner of Mental Hygiene were Dr. Falco and Mr. Kniffen, the authors of the afore-mentioned report to the commissioner. Dr. Falco testified that the petitioner would do better outside of a hospital, but that continued treatment at an out-patient clinic on a regular basis would have to be assured. Mr. Kniffen testified that petitioner seemed suitable for conditional release under a well-organized plan for supervision which should include close clinical contact. Dr. Falco conceded that the petitioner would be better, perhaps healthier, under out-patient care, but could not make a prediction as to the possibility of his committing a violent act. Mr. Kniffen also testified that he was unable to determine the degree of the petitioner's dangerousness, though he stated that he felt the petitioner was not dangerous even though he flew into rages when his demands were not met. Both of the psychiatrists appointed by the court, Drs. Binder and Pellathy, testified that the petitioner was not dangerous to himself or

others, though they differed as to the nature of his mental illness. Dr. Binder testified that the petitioner should be released outright, even though his prognosis was guarded. Dr. Pellathy testified that the petitioner was not in need of continuous psychiatric care in a hospital setting, though he expressed the view that the petitioner should be required to report back for periodic psychiatric checkups.

In accordance with the suggestion contained in *Matter of Miller (Sherman)* (46 AD2d 177, 182) that, in a hearing with respect to the discharge of a person committed to a hospital under CPL 330.20 after a verdict of acquittal by reason of mental disease, "the witnesses summoned to the new hearing should include hospital employees such as nurses, orderlies, housekeepers and others who have had daily or frequent contact with petitioner", an assemblage of such witnesses was "paraded to the witness box at the hearing". The court summed up their testimony as tending "to establish only that Lublin was from time to time embroiled in argument with others resulting in shouting and physical action on the part of either or both sides" *(Matter of Lublin v Central Islip Psychiatric Center,* 85 Misc 2d 48, 56). The court concluded that this established nothing as to his dangerousness or lack of it, which is *the statutory test.* All agreed that the petitioner had been a nuisance or was troublesome and that he easily became angry and was a discipline problem in the ward, but none attributed dangerous violence to him.

The two experts retained by the District Attorney, Dr. Zolan, a consulting psychiatrist, and Dr. O'Neill, former director of Central Islip, differed with all of the other experts. Dr. Zolan said that the petitioner was dangerous in the sense of capability to harm or injure others, and recommended that he not be released, even under supervision, adding "once a schizophrenic, always a schizophrenic." Dr. O'Neill concluded that the petitioner would be potentially dangerous living in a community and should not be released at this time. On cross-examination he also conceded that he found no evidence of psychosis. He stated that petitioner was not dangerous to himself, but is potentially dangerous to others if he is frustrated.

### THE APPLICABLE LAW

Before dealing with the legal issues in this proceeding, I feel that I should commend the petitioner's assigned counsel on

the scholarly brief submitted by him and the equally thoughtful, scholarly and concerned opinion of Judge OSCAR MUROV, whose discussion of the issue of the burden and standard of proof reflects the troublesome nature of the question *(Matter of Lublin v Central Islip Psychiatric Center,* 85 Misc 2d 48, *supra).*

Because the statute fails to specify with whom the burden of proof lies and what standard the bearer of the burden must meet, it is of no help in resolving those issues. Judge MUROV rejected the contention that those who insist upon continuing the petitioner in custody have the burden of proof, though he conceded that such a position "is not without substance, particularly in view of a series of Supreme Court decisions imposing the burden upon the People in cases where a potential loss of liberty or continued deprivation of liberty is involved. (See, e.g., *Mullaney v Wilbur,* 421 US 684; *Matter of Winship,* 397 US 358; *Matter of Gault,* 387 US 1; see, also, The Rights of the Person Acquitted by Reason of Insanity: Equal Protection and Due Process, 24 Maine L Rev 135)" (85 Misc 2d, at p 51).

Then, because the Supreme Court had not yet declared itself on the issue, the court declared (p 52) that it would "enforce the standard of proof heretofore applicable in this State * * * which requires the patient to prove by a preponderance of the evidence that he may be discharged or released upon condition without danger to himself or others" citing, as authority, *People v Lally* (19 NY2d 27), *Matter of Miller (Sherman)* (73 Misc 2d 690, vacated and remitted for a new hearing 46 AD2d 177, *supra), Bolton v Harris* (395 F2d 642) and *Millard v Harris* (406 F2d 964).

An analysis of those cases demonstrates, I believe, that they are not determinative here. In *People v Lally (supra)* there is no discussion or determination of where the burden of proof lies. In fact, in that case, there was no hearing in accordance with the predecessor statute of CPL 330.20, section 454 of the Code of Criminal Procedure. Rather, the defendant there stood on the contention that his original detention and commitment to Matteawan State Hospital under the statute (after his acquittal by reason of mental disease or defect) was unconstitutional as a denial of equal protection of the laws. Our Court of Appeals rejected that contention, saying (p 34): "The Supreme Court [in *Baxstrom v Herold,* 383 US 107] held that there was no reasonable distinction as to a civil commitment

between an ordinary citizen and a citizen whose prison term in a State prison is expiring. However, as pointed out above, the Federal cases and the *Peabody [People ex rel. Peabody v Chanler,* 133 App Div 159, affd 196 NY 525] case in this court *(supra)* have ruled that there is a reasonable ground for giving special treatment to a man who has been held not guilty because insane on his own plea to that effect. The Legislatures of this and other States have felt that such a jury verdict creates a situation where public safety as well as the defendant's safety require that he be committed and examined before returning to society."

Nowhere in its decision in *Lally* did the Court of Appeals deal with the question of where the burden of proof lies in a proceeding under the applicable section for discharge or release. Rather, despite the contention of Mr. Justice TITONE in his dissent that the court there rejected the defendant's contention that the burden of proof lies with the State, it explicitly noted (p 32) that the "papers indicate that on this motion there was no effort by defendant's counsel to show factually defendant's present mental condition." Thus, since Lally did not go forward with any evidence to show that he could, at the time of the hearing on his application, be discharged or released (on condition) without danger to himself or others, there was no occasion for the court to determine who had the ultimate burden of proof.

Despite that, the *Lally* court reflected its concern that the section (Code Crim Pro, § 454, now CPL 330.20) not be allowed to become a means of indefinitely confining persons such as the defendant in a hospital for the insane, declaring (p 35): "To provide defendant with protection equal to that of other persons under the New York State statutes as to adjudications of mental incompetency we may and do read into subdivision (5) * * * a provision for a jury trial of these issues, if appellant so requests."

*Matter of Miller (Sherman)* (73 Misc 2d 690, vacated and remitted for a new hearing 46 AD2d 177, *supra),* also cited by Judge MUROV, did not discuss the question of where the burden of proof lay, other than to say, after finding that the petitioner there represented a danger to himself and to others if released (73 Misc 2d, at p 710): "Implicit in this finding is that he [the petitioner] has failed to meet the burden of proving the contrary by a fair preponderance of the credible evidence, the standard of proof required in a proceeding of

this kind. *(People v. Chapman,* 56 Misc 2d 139; see, also, for the same standard in determining competency to stand trial, *People v. Gibbons,* 63 Misc 2d 354.)" On appeal the Appellate Division vacated the order denying the application and remitted the matter to the County Court for a new hearing. In this connection it should be noted that the petitioner apparently did not challenge the court's assumption that the burden of proving that he was not dangerous to himself or others lay with him. It is highly significant therefore that, despite that fact, the Appellate Division quoted (p 181) the following language from Judge BAZELON, in *Covington v Harris* (419 F2d 617, 627): "Moreover, once a man has shown himself to be dangerous, it is all but impossible for him to prove the negative that he is no longer a menace." This court went on to quote (p 182) Judge BAZELON's prior statement in *Millard v Harris* (406 F2d 964, 973, *supra*): "Substantively, there is serious question whether the state can ever confine a citizen against his will simply because he is likely to be dangerous in the future, as opposed to having actually been dangerous in the past." The Appellate Division also rejected a suggestion in an article by a director of a mental hospital, which article appeared in a local newspaper, that it is prudent and just to presume that a man who has committed an unlawful act will repeat the offense, asking rhetorically (46 AD2d, at p 182): "Following this statement to its logical conclusion, should any court release petitioner?"

*People v Chapman* (56 Misc 2d 139), also cited by the County Court, was a proceeding under section 454 of the Code of Criminal Procedure to either discharge the petitioner (who had been found not guilty of manslaughter by reason of insanity) from Matteawan State Hospital or to transfer him to a civil institution. The court there said (p 142): "In this novel proceeding I decreed that with respect to branch one (discharge) the petitioner has the burden of proof by a preponderance of the evidence." The court then found that the petitioner had failed to sustain his burden and found, as a fact, that if petitioner were to be discharged he would be a danger to himself and others. But there is no indication in the decision that petitioner put in issue the question of who had the burden of proof, or that the court was aware of the questions raised by Judge BAZELON in *Millard v Harris* (406 F2d 964, *supra*).

The *Millard* case, also cited by the County Court in this case

as sustaining its ruling that the petitioner has the burden of proof of establishing his lack of dangerousness, was a habeas corpus proceeding which attacked the validity of the petitioner's continued commitment to Saint Elizabeth's Hospital in Washington, DC under the Sexual Psychopath Act (DC Code, §§ 22-3503—22-3511). The petitioner's attack was leveled against the constitutional validity of the act and the finding of the court below that he "remains a sexual psychopath". In reversing the District Court's dismissal of the petition, the majority of the Court of Appeals of the District of Columbia found it unnecessary to pass upon the constitutionality of the statute because it was "able to conclude that he [the petitioner] has borne his burden in this habeas corpus proceeding to show by a preponderance of the evidence that his continued confinement as a sexual psychopath is not justified under the statute as we have construed it" (406 F2d, at pp 973-974). In that case, too, there is no indication that the petitioner challenged the allocation of the burden of proof, or that the court was, in fact, ruling on that question, since it found from a perusal of the record that the petitioner had, in any case, established that there was no justification under the statute for his further confinement.

It thus appears that none of the cases cited by Judge MUROV, in fact, sustains his ruling that the petitioner had the ultimate burden of establishing his lack of dangerousness and consequent right to conditional release from confinement. However, this court, on May 17, 1976, in *Matter of Richard E. R.* (52 AD2d 927), on an appeal from an order which denied an application for discharge or release of a committed person from the custody of the Commissioner of Mental Hygiene pursuant to CPL 330.20 (subd 5), said: "In our opinion petitioner failed to sustain his burden of proving, by a preponderance of the credible evidence, that, at the time of the hearing, he was capable of being released without presenting a danger to himself or to others". But in that case, too, the petitioner never raised the burden of proof issue. Instead his contention was that since he was no longer ill and required no treatment, his continued commitment constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and that, consequently, the hospital in which he was confined was, in reality, a prison where he could be held indefinitely for no convicted offense. Citing *People v Lally* (19 NY2d 27, *supra*), we rejected his

constitutional contention and sustained the findings that the petitioner was under a delusion that he was well and that he would require continued psychotherapy and medication to prevent further episodes of illness and possible violent acts, and that his continued confinement in the hospital was therapeutic as well as protective. Our opening comment as to the burden of proof was, therefore, immaterial to the decision and constituted pure dictum.

In *State v Krol* (68 NJ 236) the New Jersey Supreme Court recently dealt with an issue quite similar on its facts to that in the case before us. While the applicable New Jersey statute (NJSA 2A:163-3), like our CPL 330.20, requires the court in which a defendant is acquitted on the ground of insanity to remand such a defendant to a State psychiatric hospital if it finds his "insanity continues", "until such time as he may be restored to reason", it contains no specific test of dangerousness. Nevertheless, the court read into the statute a test of danger to society and dealt with the issue of the burden of proof in the following language (68 NJ, at pp 253-254): "The State argues that persons acquitted by reason of insanity pose a special hazard to the public because they have been convicted of committing a criminal act and have proven by a preponderance of the evidence that the act resulted from mental illness * * * and that therefore they constitute an 'exceptional class' of persons in whose confinement and treatment the State has a special interest. Accepting *arguendo* the factual assumption upon which this claim is predicated—that persons acquitted by reason of insanity pose a greater hazard to the public than other mentally ill persons—the argument does not support a claim that the State should not be required to establish that the particular defendant poses a danger to himself or society."

The court there also noted that commitment for mental illness, involving as it does serious infringement of personal liberty, poses an issue of constitutional dimension, saying (p 248): "Constitutional principles of due process require that any state action bear a reasonable relationship to some legitimate state purpose. In *Jackson v. Indiana*, 406 U. S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), the United States Supreme Court, applying this principle to involuntary commitment proceedings, held that the standard for commitment must bear a reasonable relationship to the ostensible purpose for which the individual is committed. That decision, which in-

volved the commitment for incompetency to stand trial of a mentally deficient deaf-mute accused of armed robbery, did not restrict the purposes for which the state might involuntarily commit individuals accused of crime; it did require that the state tailor its standard for commitment to whatever purpose it was nominally attempting to advance * * * *Furthermore, the state must make a meaningful factual determination as to whether defendant actually meets the standard for commitment"* (emphasis supplied).

Among the cases cited by the New Jersey court to support its conclusion were *Bolton v Harris* (395 F2d 642, *supra),* which was described as involving a commitment "following acquittal by reason of insanity", *People v McQuillan* (392 Mich 511, 529-534) and *State ex rel. Kovach v Schubert* (64 Wis 2d 612, 623, app dsmd 419 US 1117). Those cases, properly construed, bar any presumption that *past* mental illness, i.e., acquittal by reason of insanity, demonstrate *present* dangerousness on the part of the person committed.

The dissent of Mr. Justice TITONE, though replete with citations of authority, fails to distinguish between the burden of going forward with proof in the first instance in a proceeding initiated by a committed person under CPL 330.20 (subd 5), and the ultimate burden of proof of establishing that the committed person is presently dangerous to himself or others and must therefore be continued in confinement. He contends that the Legislature "has a right to maintain that one such as the appellant, who has been acquitted of a crime, especially a crime of violence by reason of a mental disease or defect (insanity) * * * may [be detained] for a period to determine whether insanity continues and whether he would be dangerous to himself or others if released from confinement in a mental institution (citing cases)." This, in essence, is a statement that there is a presumption of fact that one judicially found to have suffered from a "mental disease or defect" may thereafter be deemed to be a "danger to himself or to others" until, by a preponderance of evidence, he establishes the contrary. However, while there may be a presumption of continuance of insanity (i.e., a "mental disease or defect"), because insanity was established by the verdict of acquittal, *there is no factual presumption of present dangerousness, which is the test for release under the statute.* Accordingly, while the petitioner, as the initiator of the proceeding, had the burden of going forward with facts to raise an issue with

respect to his lack of dangerousness, the ultimate burden of proof on that issue, *which had not theretofore been judicially determined in any forum,* rested upon the State, which desired to keep him committed. Here the burden of going forward in the first instance was met by the petitioner when he presented the testimony of the two psychiatrists who had treated him at Central Islip and of the director of Central Islip that he was not dangerous. Thereupon, the State had the duty of meeting its constitutionally established burden of proving by a preponderance of the evidence that the petitioner was *presently* dangerous and that, therefore, the State could continue to deprive him of his liberty by confining him in a mental hospital.

Mr. Justice TITONE, in his dissent, cites many out-of-State cases in an effort to support his conclusion that a defendant who has been acquitted of a crime of violence because he was found to be insane can, under our statute, be required to establish by a preponderance of the evidence that he is not presently dangerous to himself or others as a condition of obtaining his release from a mental hospital. Analyzing each of those cases would unduly extend this opinion. The key fact is that they deal with statutes basically different from ours (see, e.g., *Bolton v Harris,* 395 F2d 642, *supra; State v Shackford,* 262 A2d 359 [Me]). Our statute (CPL 330.20, subds 1, 2, 3, 5) requires the court in which a verdict of acquittal by reason of mental disease or defect is rendered to commit the defendant to the custody of the Commissioner of Mental Hygiene, to be placed in a State mental hospital, and not to be released until the court, after a hearing which may be initiated by the commissioner or by the defendant, is satisfied that the defendant is not dangerous to himself or others. The statute authorizes the court in which such a hearing is held to appoint two qualified psychiatrists to examine the defendant and report to it their opinion as to his mental condition. The court must order the discharge of the defendant or his release (on condition) if it is satisfied that this may be done without danger to himself or others. Thus, while the statute, in subdivision 1, does implicitly create a factual presumption that a person acquitted by reason of mental disease continues to suffer from that mental disease, it provides a machinery in sub divisions 2, 3 and 5 allowing the commissioner or the petitioner to obtain a court hearing to determine whether there is a need to continue his confinement in a mental hospital, with the

determining factor being whether the court is satisfied that the person confined may be discharged or released (on condition) "without danger to himself or to others." Mr. Justice Titone concedes that the test to be applied to determine whether the committed person is to be released is "whether he is still in such a dangerous condition that continued confinement is justified", but argues that "where the underlying act was one of extreme violence, reasonable medical doubts and judicial doubts should be resolved in favor of the public *(State v Shackford, supra; Ragsdale v Overholser,* 108 US App DC 308, affd 281 F2d 943) and, a fortiori, the burden of proof should devolve upon the detainee to show that he no longer constitutes a danger to himself or others".[1] Thus, Mr. Justice Titone would make the determination of where the burden of proof on the issue of *present* dangerousness rests, a determination which may well be decisive of the issue of the detainee's continued deprivation of liberty by the State, depend not upon whether the State can establish that fact by a preponderance of the evidence, but rather upon whether the crime with which the detainee was charged and of which he was acquitted because of mental illness, was of "extreme violence" and whether the petitioner can, on the hearing under CPL 330.20, produce evidence which eliminates "reasonable medical doubts and judicial doubts". I answer that viewpoint by stating, as emphatically as I know how, that medical and judicial *doubts* as to *future* dangerousness can never serve to sustain one's *present* deprivation of liberty. Such a test fails to pay even lip service to the constitutional standard set forth by the Fourteenth Amendment for deprivation of liberty as interpreted in *Mullaney v Wilbur* (421 US 684, *supra), Matter of Winship* (397 US 358, *supra)* and *Matter of Gault* (387 US 1, *supra).* Similarly, Mr. Justice Titone's allusion to the petitioner's long history of mental illness, the severity and violence of the crime with which he was charged, his effort to injure himself after his alleged wrongdoing and his having been a difficult patient to cope with, can only serve to confuse the issue of whether he or the State bears the burden of proving whether he is *presently* dangerous to the public and should therefore continue to be deprived of his liberty by the State.

---

1. The *Ragsdale* case *(supra)* upon which Mr. Justice Titone so heavily relies, was expressly overruled later in the same circuit by *Bolton v Harris* (395 F2d 642, *supra),* although *State v Shackford (supra)* which Mr. Justice Titone likewise cites, preferred the conclusion espoused by *Ragsdale,* saying it found its reasoning "compelling".

I therefore conclude that, in requiring the petitioner to prove by a preponderance of the evidence that he was not presently dangerous to himself or to others as a condition of his being released (even conditionally) from confinement in a mental hospital, the court infringed upon the petitioner's constitutional rights. Under the circumstances, the order denying the petitioner a conditional release from the Central Islip Psychiatric Center should be reversed and the proceeding remanded to Judge Murov to make a new determination upon the record heretofore made and upon such other proof as the parties may offer, not inconsistent with this opinion.[2]

### THE PERIPHERAL ISSUES

Since we are remanding for a further hearing in which the State must undertake to establish by a preponderance of the evidence that the petitioner would be dangerous to himself or others if he were released and, failing that, what conditions, if any, ought be imposed by the court on the petitioner's release to minimize the likelihood of the later development of such a danger, I deem it appropriate to comment on the other issues raised by the petitioner in order to provide guidance to the County Court.

I find no merit in the petitioner's objection to the court's orders authorizing the District Attorney to employ two qualified psychiatrists to examine the petitioner and to testify at the hearing. CPL 330.20 (subd 2) provides for transmittal "to the district attorney of the county from which the defendant

---

2. Our conclusion as to the burden of proof is buttressed by an examination of the sections of our Mental Hygiene Law which govern the involuntary commitment of a person to a hospital for the mentally ill and the retention in such a hospital of an involuntary patient. Section 31.27 requires the prior certification by two examining physicians of the need for involuntary care and treatment of the person committed, followed by an examination by a physician who is a member of the psychiatric staff of the hospital in which the person is sought to be committed. The director of the hospital is required, by section 31.29, to give notice within five days of the involuntary admission to the nearest relative of the person alleged to be mentally ill. Section 31.31 protects the right of a person involuntarily committed to a hearing before a court on the question of his need for involuntary care and treatment at any time prior to the expiration of 60 days from the date of the involuntary commitment. Those sections, and others in the article in the statute governing hospitalization of the mentally ill, all reflect the Legislature's awareness of the fact that such a commitment adversely affects the personal liberty of the person committed and that such commitments must be surrounded with strong safeguards to insure that no commitment is made and continued without a showing of a State need for such action.

was committed" of the information upon which the Commissioner of Mental Hygiene relies in seeking the discharge of a person committed to his custody, where the commissioner is the petitioner. Implicit in that provision is the right of the District Attorney to appear and call witnesses at the hearing, if he be so inclined; for otherwise what purpose would there be in providing for the service of the application and the papers in its support upon him? Since CPL 330.20 (subd 5) provides that when a committed person makes "application for his discharge or release * * * the court must follow the procedure prescribed in subdivisions two and three of this section", the ruling of the County Court in permitting the District Attorney to participate in the proceeding and to call witnesses, was proper (cf. *Matter of Miller,* 46 AD2d 999).

Furthermore, permitting the District Attorney to employ experts to provide the court with their views as to the petitioner's current status with respect to the statutory test of danger to himself or others could aid the court in determining the question correctly and, if the court found him not to be dangerous, in determining what conditions, if any, it should impose upon the petitioner's release to minimize the possibility of a recurrence of violent criminal conduct on his part.

We have considered petitioner's remaining "closed hearing" contention and find it to be without merit.

TITONE, J. (concurring in part and dissenting in part). I fully agree with the views of my eminent colleague, Mr. Justice SHAPIRO, that the petitioner appellant's request for a closed hearing is without merit and that the District Attorney was entitled to participate in the judicial proceeding held on the appellant's application for discharge or release (see CPL 330.20, subds 2, 5). However, I cannot subscribe to his conclusion that the hearing court infringed upon the appellant's constitutional rights by requiring him to prove that he was not presently dangerous, and thus could be safely released from the mental institution.

The record reveals that the appellant has undergone treatment for his psychiatric problems since he was eight years old and has been seen by psychiatrists over a period of 28 years. With respect to the underlying charge which constitutes the gravamen of this proceeding, the record also reveals that, on October 4, 1971, the appellant threw himself off an overpass onto the Long Island Expressway. When the police went to his home to notify his wife of the occurrence, they found her dead

with over 80 stab wounds inflicted by the use of an awl. In May, 1973 former County Court Judge PIERRE G. LUNDBERG ruled, after a nonjury trial, that while there was evidence that the appellant killed his wife, he was not aware of what he had done at the time because he was insane. Accordingly, he found the appellant not guilty by reason of insanity (cf. Penal Law, § 30.05, subd 2), and committed him to the custody of the Commissioner of Mental Hygiene, who shortly thereafter had him placed in the Central Islip Psychiatric Center, in accordance with CPL 330.20 (subd 1).

At the hearing brought on by the appellant's application for discharge (see CPL 330.20, subds 2, 5), although testimony was adduced that the appellant was not presently psychotic and might safely be released without danger to himself or others, other witnesses were of the opinion that he had a propensity for violence and was still potentially dangerous. All of the institution's staff members who testified, professional and nonprofessional alike, clearly indicated that since the appellant was an exceedingly difficult patient to cope with, they would be greatly relieved if he obtained his release. After weighing and sifting the evidence, the County Court, correctly in my opinion, determined that the appellant had failed to sustain his burden of proving that he was ready for release upon condition without danger to himself or others.

Inherent in a finding by the trier or triers of the fact that a person such as the appellant was not guilty by reason of a mental disease or defect (especially in this State where a defendant must plead such a defense), is the conclusion that he did the acts complained of.

Because of the finding herein, the appellant became one who was held blameless and was free frrom punishment for an act otherwise subject to criminal sanctions (see *State v Shackford*, 262 A2d 359 [Me]). However, the Legislature has a right to maintain that one such as the appellant, who has been acquitted of a crime, especially a crime of violence, by reason of a mental disease or defect (insanity), may very well be dangerous to himself or others, and, accordingly, may provide for his detention for a period to determine whether insanity continues and whether he would be dangerous to himself or others if released from confinement in a mental institution (see *People v Lally*, 19 NY2d 27, 33; *People ex rel. Peabody v Chanler*, 133 App Div 159). The appellant, and others similarly situated, are not deprived of their constitu-

tional rights because the statute under which they are confined after the acquittal by reason of insanity, prescribes no minimum period of detention during which a determination as to dangerousness must be made, since the detainee himself may bring on a petition for release at any time and have a judicial hearing as to whether he is still in such a dangerous condition that continued confinement is justified (see CPL 330.20, subd 5; cf. *People v Lally, supra,* pp 33-34; *People ex rel. Peabody v Chanler, supra,* pp 163-165).

Thus, it follows that in a hearing pursuant to CPL 330.20, the public has a special interest in the detainee's confinement and release. When consideration is given to his possible release, the public interest (and also the detainee's best interest) must be weighed against his claimed right to be set free. In my opinion, where the underlying act was one of extreme violence, reasonable medical doubts and judicial doubts should be resolved in favor of the public (see *State v Shackford, supra; Ragsdale v Overholser,* 108 US App DC 308, affd 281 F2d 943) and, a fortiori, the burden of proof should devolve upon the detainee to show that he no longer constitutes a danger to himself or others.

Contrary to the position taken by the majority, I find that legal precedent in this State clearly, unequivocally and overwhelmingly, supports the County Court's determination on the burden of proof issue. Specifically, in *People ex rel. Thaw v Lamb* (118 NYS 389), Special Term, Westchester County, held that under section 454 of the Code of Criminal Procedure (the predecessor statute of CPL 330.20 under which the appellant proceeded), the individual acquitted in a prosecution for homicide because of insanity had the burden of proving, in a habeas corpus proceeding seeking his discharge, that since the commission of the homicide, he had become sane to the degree that it was reasonably certain that his enlargement (release) would be without menace to the public health or safety.

When *People ex rel. Thaw v Lamb* reached this court under the title *People ex rel. Peabody v Chanler* (133 App Div 159, affd 196 NY 525, *supra),* we upheld the constitutionality of section 454. We stated, *inter alia,* that in enacting such section, the Legislature had expressly limited the effect of an acquittal by reason of insanity in the exercise of the police power, so that it might not be an absolute discharge in course, but that the court might order the detention of the defendant as a dangerous insane person until his reason was restored.

The majority of this court concluded with the following language (133 App Div 159, 164-165): "And I think that such a defendant, by this provision of the Code of Criminal Procedure, had notice and a hearing that contemplated the process whereby he might thus be committed [acquittal by reason of insanity], and that in any event the provisions of express law whereby *he could forthwith institute proceedings to establish his sanity and his consequent right to instant discharge,* satisfy the safeguards invoked against this provision of the law" (emphasis supplied).

Furthermore, contrary to the position taken by the majority, I believe that *People v Lally* (19 NY2d 27, *supra)* clearly stands for the proposition that the burden of proof lies with the detainee in a situation similar to the one now before this court.

In *Lally* the appellant was arrested and arraigned after he had shot and wounded three persons in Queens County. The jury trial, on his indictment for assault and carrying a dangerous weapon, resulted in an acquittal on the ground of insanity. He was thereafter committed to the custody of the Commissioner of Mental Hygiene and subsequently placed in a mental institution pursuant to section 454 of the Code of Criminal Procedure. A short time later Lally petitioned the court to be released under such section. In denying the application the Supreme Court, according to the Court of Appeals (19 NY2d 27, at p 32), held that the section was *not unconstitutional as requiring a defendant so committed to prove his sanity.* This court affirmed the order denying Lally's application without opinion (25 AD2d 720).

Our highest court remitted the matter in order that Lally might be provided with a jury trial on the issue of his mental incompetency, if he so requested. However, with respect to the constitutional issue raised by Lally, i.e., that under section 454 he was required to prove his sanity before being released, then Chief Judge DESMOND stated (19 NY2d 27, 32): "The papers indicate that on this motion there was no effort by defendant's counsel *to show factually defendant's present mental condition.* Counsel stood on the same argument *he makes on this appeal,* that is, that section 454 is unconstitutional because: *'It raised the presumption that a defendant who proves that he was insane at the time of an alleged crime* is presumed to be insane at the time of trial *if the trial results in acquittal, and*

*he must thereafter prove his right to be at large'"* (emphasis supplied).

In rejecting the argument contesting the constitutionality of section 454, the Court of Appeals cited the following three cases, stating that the reasoning in each "is sound": *People ex rel. Peabody v Chanler* (133 App Div 159, affd 196 NY 525, *supra), Ragsdale v Overholser,* 281 F2d 943, *supra)* and *Lynch v Overholser* (369 US 705). I have already discussed the *Peabody* case with respect to its clearly establishing that the detainee has the burden of proof in these matters.

With respect to *Ragsdale v Overholser (supra),* the constitutionality of a District of Columbia statute, similar to section 454 of the Code of Criminal Procedure, was put in issue. In an opinion by Mr. Justice BURGER (now Chief Justice of the United States), the Circuit Court held that the placing of the burden of proof for release upon the person committed to a mental institution by virtue of an acquittal by reason of insanity, violated no constitutional guarantee, for it had no relation to the presumption of guilt or innocence (281 F2d 943, 949).

In *Lynch v Overholser* (369 US 705, *supra),* the reasoning of which was also held to be "sound" in the *Lally* case by the Court of Appeals, the Supreme Court held that a defendant found to have been insane at the time of the commission of the offense, but who did not raise insanity as a defense, could not be confined in a hospital for the mentally ill without further proceedings under section 24-301 (d) of the Code of the District of Columbia. However, the majority of the Justices on our Nation's highest court also found it necessary in *Lynch* to make the following remarks (p 715): "The criminal defendant who chooses to claim that he was mentally irresponsible when his offense was committed is in quite a different position. It is true that he may avoid the ordinary criminal penalty merely by submitting enough evidence of an abnormal mental condition to raise a reasonable doubt of his responsibility at the time of committing the offense. Congress might have thought, however, that having successfully claimed insanity to avoid punishment, the accused should then *bear the burden of proving that he is no longer subject to the same mental abnormality which produced his criminal acts.* Alternately, Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity."

Moreover, the court in *Lynch* also saw fit to quote, with obvious approval, the following statement by the Committee on Mental Disorder, which recommended the eventual enactment of subdivision (d) of section 24-301 of the Code of the District of Columbia and whose report was embraced in the report of the Senate and House Committee (p 717): " 'The Committee believes that a mandatory commitment statute would add much to the public's peace of mind, and to the public safety, without impairing the rights of the accused. *Where accused has pleaded insanity as a defense to a crime,* and the jury has found that the defendant was, in fact, insane at the time the crime was committed, it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and that the accused should automatically be confined for treatment until it can be shown that he has recovered' " (emphasis in original).

Thus, summarizing the constitutional argument raised in *Lally,* and the Court of Appeals' determination therein, I find as determinative the following: (1) The only constitutional issue raised by Lally in the Court of Appeals was that, although he was found not guilty of the crimes charged in the indictment by reason of his insanity, it was unconstitutional to require him to prove his sanity before being released from the mental institution to which he was committed after the jury verdict. (2) The Court of Appeals rejected such argument and, relying upon the soundness of the reasoning in the *Peabody, Ragsdale* and *Lynch* cases *(supra),* held section 454 of the Code of Criminal Procedure to be constitutional. (3) Not only the thrust, but also the language used by the respective courts in *Peabody, Ragsdale* and *Lynch,* clearly reveal that those courts have held that the burden of proof devolves upon the detainee to show that he is no longer dangerously ill and, a fortiori, that he no longer constitutes a danger to himself and to society (cf. *People v Chapman,* 56 Misc 2d 139).

I also take issue with the majority's contention that one sentence used in a recent case by this court, which also involved a denial of an application under CPL 330.20 (subd 5), constituted mere "dictum" *(Matter of Richard E.R.,* 52 AD2d 927). Specifically, I refer to the opening sentence, which is to the effect that petitioner failed to sustain his burden of proving, by a preponderance of the credible evidence, that at the time of his hearing he was capable of being released without presenting a danger to himself and others (citing CPL

330.20). Having been a member of the court panel which heard *Richard,* I can attest that I believed then, as I believe now, that such sentence constituted an integral and essential portion of the whole opinion.

I also note that, with a few possible exceptions, courts in other States have also held that where a person has been confined in a mental institution upon an acquittal by reason of insanity or mental defect or disease, the burden of proof devolves upon such person to demonstrate that he may be discharged without danger to himself or others (see Ann 95 ALR2d 54, 106-108).

For example, in *Bolton v Harris* (395 F2d 642, 653), cited by the majority to support its position, the following language is found: "It could be argued that the Government should have the burden of proving that the patient is still committable, since this is where the burden lies in the initial commitment proceeding. But the traditional rule in habeas corpus proceedings is that the petitioner must prove, by the preponderance of the evidence, that his detention is illegal * * * Thus, the court must find, by the preponderance of the evidence, that the patient's commitment is no longer valid—i.e., *that he is no longer 'likely to injure himself or other persons' due to 'mental illness'* " (emphasis supplied).

Similarly, the California Supreme Court, in *Matter of Franklin* (7 Cal 3d 126), held that persons who have been committed following their acquittal of criminal offenses by reason of insanity, may obtain their release by establishing, by a preponderance of the evidence, that they are no longer a danger to the health and safety of themselves and others. California's highest court further held that the fact that a defendant must prove his insanity by a preponderance of evidence at the trial constitutes a very solid basis upon which a presumption of continuing mental illness may rest.

In *State v Taylor* (158 Mont 323, cert den *sub nom Taylor v Montana,* 406 US 978) the Supreme Court of Montana not only indicated that a defendant, placed in a mental institution after an acquittal by reason of mental disease or defect, had the burden of proving that he may be safely discharged or released, but also that he had to establish, by evidence convincing in effect beyond a reasonable doubt, that his release could be implemented without danger to the public. Certiorari was thereafter denied by the Supreme Court of the United States, with BRENNAN, WHITE and BLACKMUN, JJ., voting that

it be granted *(Taylor v Montana,* 406 US 978; see, also, *State v Shackford,* 262 A2d 359 [Me], *supra).*

In my opinion, the issue in this area which really divides the courts throughout the country is not which party has the burden of proof, but rather, what is the standard or quantum of proof that the individual must meet to show that he no longer constitutes a danger to himself or to others. Thus, in *Hefley v State* (480 SW2d 810 [Tex]), *State ex rel. Barnes v Behan* (124 NW2d 179 [SD]), *Matter of Franklin* (7 Cal 3d 126) and *Matter of Palmer* (26 RI 486), the courts have held, in essence, that the person seeking discharge after a verdict of not guilty by reason of insanity, must show by a preponderance of evidence that his release would not be dangerous to himself or the public (see, also, *People ex rel. Thaw v Lamb,* 118 NYS 389, affd *sub nom People ex rel. Peabody v Chanler,* 133 App Div 159, affd 196 NY 525, *supra);* whereas, in other jurisdictions, the applicant must establish his eligibility for release beyond a reasonable doubt *(State v Shackford,* 262 A2d 359 [Me], *supra; Ragsdale v Overholser,* 108 US App DC 308, affd 281 F2d 943, *supra; State v Taylor,* 158 Mont 323, cert den *sub nom Taylor v Montana,* 406 US 978, *supra).*\*

Thus, I do not accept the majority's conclusion that the County Court infringed upon the appellant's rights by requiring him to show by a preponderance of evidence that he is not presently dangerous. Generally speaking, it is within the power of the State, without denial of the equal protection of the laws, to regulate and determine, either through the Legislature, or through the courts, questions relating to the burden of proof *(People v Morrison,* 125 Cal App 282, app dsmd *sub nom Morrison v California,* 288 US 591; 16A CJS, Constitutional Law, § 562).

In the last analysis, and aside from the burden of proof question, it should be noted that no one at any time has suggested, or even intimated, that the appellant was not afforded a full, complete and fair hearing at the discharge proceeding in the County Court; nor would the record support

---

\*It should be noted that although there is an indication in a subsequent decision of the same Federal Circuit Court *(Bolton v Harris,* 395 F2d 642, *supra)* that *Ragsdale* was "expressly overruled" (according to the majority's footnote), the fact is that the *Bolton* case overruled *Ragsdale* with respect to *quantum of proof,* not the burden of proof. *Bolton* held that the detainee needed to establish that he no longer constituted a danger to himself or others by a preponderance of the evidence, while *Ragsdale* held that the fact had to be established beyond a reasonable doubt.

any such assertion, assuming it had been made. In my opinion, after viewing only the evidence in support of the appellant's application, I have very serious doubts as to the wisdom of his being released at the present time. When coupling it with the evidence adduced in opposition to the application, I believe the determination denying release was fully warranted. It is axiomatic that a person who has had his day in court, and a trial or hearing according to the usual procedure (which occurred in this instance), is not denied equal protection of the laws by a verdict or finding against him which is supported by sufficient evidence, although the evidence may be conflicting or doubtful (see 16A CJS, Constitutional Law, § 562).

I might add that I am not wedded to an inflexible rule with respect to the burden of proof in every proceeding brought by a detainee under the governing statute herein, which is silent in that regard (see CPL 330.20).

I believe that the more realistic approach that should be taken by the hearing tribunal would be to first examine each application for release, taking into account, amongst any other relevant factors, the nature of the underlying charge, the detainee's previous psychiatric history and the length of time he has been confined after the acquittal. For example, in *Waite v Jacobs* (475 F2d 392) the appellant was committed to a mental institution in 1961, after having been found not guilty by reason of insanity of the crime of assault with a dangerous weapon. Noting, *inter alia,* that appellant had been confined for over 9 of the 10 years by reason of such acquittal for which he might have been sentenced criminally, the Circuit Court for the District of Columbia held (correctly, I believe) that the trial court should consider whether the government should bear the burden of proving that his continued confinement was justified.

In conclusion, I voice some disagreement with the premise enunciated in *Millard v Harris* (406 F2d 964), and quoted both in *Matter of Miller (Sherman)* (46 AD2d 177, 181) and in the majority opinion, namely, that "'once a man has shown himself to be dangerous, it is all but impossible for him to prove the negative that he is no longer a menace.'" Implicit in such pessimistic and defeatist language is the suggestion that members of the judiciary hearing these matters have imposed, and will invariably impose, an impossible burden upon a detainee seeking his release.

For my part, I am confident that my judicial brethren take neither a "throw away the key" approach nor, conversely, an "open up the floodgates" attitude, in these matters, but rather decide each one on the facts presented, weighing carefully and fairly, both the best interest of the individual, and the rights of society.

DAMIANI, J. (concurring in part and dissenting in part). CPL 330.20 (subd 3) provides: "If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary."

The statute is silent as to whether the burden of proof on this issue is upon the petitioner or the respondent. The closeness of this question is amply illustrated by the majority and minority opinions of my Associate Justices and the opinion of the County Court Judge.

An examination of the New York cases on this subject would ordinarily lead one to the conclusion arrived at by the Judge presiding at the County Court, viz., that the burden of proof is upon the patient. In fact, this court made the same assumption in *Matter of Richard E.R.* (52 AD2d 927), decided more than five months after the decision of the County Court. The majority herein has, however, decided to distinguish *Matter of Richard E.R.* and the cases relied upon by the County Court.

It is my opinion that, regardless of which party had the burden of proof, the evidence in this record is sufficient to sustain the County Court's finding that the petitioner was not "ready for release upon condition without danger to himself or others." After a full hearing, the court, while applying what it considered to be the New York rule that the burden of proof was upon the petitioner to prove he was ready for release and that he failed to sustain that burden, nevertheless, made the following findings *(Matter of Lublin v Central Islip Psychiatric Center,* 85 Misc 2d 48, 55-57):

"Six expert witnesses testified that Lublin is neither a danger to himself nor to others. The testimony of two of them is suspect since they had only months earlier expressed some anxiety concerning petitioner's harassing and/or homicidal proclivities. The testimony of one of the latter two is accorded little weight here since that witness seemed inclined to take a

stand consistent with the position previously adopted by him whereby he 'went along' with the recommendations of his colleagues.

"The director of the facility favored Lublin's release according to some ill-defined program for aftercare or convalescent care. The recommendation of the director is construed by Lublin's counsel as a tacit admission or implication that the director felt that petitioner is not 'dangerous'. The court noted from the director's testimony that he studiously avoided contact with Lublin. In evaluating the director's testimony, the court is unable to draw the same inferences as does counsel, as to the director's assessment of Lublin's dangerous potential.

"One of the experts, the author of the multi-discipline panel report, recommended out-patient treatment for Lublin but declined to address himself to the issue of dangerousness.

"In summary, four of the experts gave unassailable testimony in favor of Lublin's readiness for release, but only one of them recommended outright release.

"Two experts introduced by the District Attorney, unequivocally oppose release. It was their opinion that Lublin possessed the psychological bent to seek deep dependent personal relationships with others of the precise kind that resulted in his wife's death; that Lublin would not participate in a treatment plan administered in an unstructured setting.

"It has been urged that potential danger to the community and to Lublin himself dissipates if emotionally dependent relationships are avoided or restrained. The court feels the likelihood that Lublin will avoid, be unable to, or be effectively restricted from, pursuing emotionally dependent relationships runs contrary to both his nature and to human nature. The court would add that Lublin's record of co-operation with authorities makes it doubtful that he would long abide by any rules insulating him from those to whom he is drawn or that he would continue to accept medication necessary to keep him in a tranquil state.

"The testimony of hospital personnel tended to establish only that Lublin was from time to time embroiled in argument with others resulting in shouting and physical action on the part of either or both sides. No one testified that he was easy to live with. The contrary would be more likely the consensus opinion.

\*     \*     \*

"The decision herein is not designed to, nor should it obstruct therapeutic goals. If those charged with the responsibility of caring for the petitioner feel he will benefit from a less restrictive environment than confinement affords, it is within their power to provide such an environment (Mental Hygiene Law, § 29.15). It should be borne in mind that therapy under the least restrictive alternative is the purpose and manner of the continued confinement of Mr. Lublin *(Cross v Harris,* 418 F2d 1095, 1102, *supra; Covington v Harris,* 419 F2d 617, 623; see, also, Bazelon, Institutionalization, Deinstitutionalization and The Adversary Process, 75 Col L Rev 897). Should the hospital at any time abandon the pursuit of these goals, such a decision would be an appropriate subject for judicial review *(Covington v Harris, supra,* p 624).

"In view of the foregoing, it is the judgment of this court that the petitioner, Laurence Lublin, is directed to be retained at the Central Islip Psychiatric Center until such time as it is established he may be discharged or released upon conditions without danger to himself or others."

Those findings are amply supported by the evidence and, in my opinion, are sufficient to sustain the determination of Special Term and a remand will, in all probability, produce the same result and serve no useful purpose. Consequently, I would affirm the order dated January 8, 1976.

HOPKINS, Acting P. J., and MARGETT, J., concur with SHAPIRO, J.; DAMIANI and TITONE, JJ., concur in the disposition of the orders dated September 10, 1975, September 17, 1975 and February 23, 1976, respectively, but otherwise dissent and vote to affirm the order dated January 8, 1976, with separate opinions, TITONE, J., concurring in the dissenting opinion of DAMIANI, J.

Two orders of the County Court, Suffolk County, both dated September 10, 1975, affirmed; order of the same court, dated September 17, 1975, affirmed insofar as appealed from, all without costs or disbursements.

Appeal from an order of the same court dated February 23, 1976, dismissed, without costs or disbursements. No appeal lies from an order which denies reargument.

Order of the same court, dated January 8, 1976, reversed, without costs or disbursements, and proceeding remitted to the County Court for further proceedings in accordance with the opinion of Mr. Justice SHAPIRO.